## HELLENIC LINES LTD. et al. *v.* RHODITIS

No. 661.   Argued April 21, 1970—
Decided June 8, 1970

*James M. Estabrook* argued the cause for petitioners. On the briefs was *George F. Wood*.

*Joseph B. Stahl* argued the cause and filed a brief for respondent.

Briefs of *amici curiae* urging reversal were filed by *Mr. Estabrook* and *David P. H. Watson* for the Royal Greek Government, and by *John R. Sheneman* and *Edwin.K. Reid* for the Greek Chamber of Shipping et al.

Briefs of *amici curiae* urging affirmance were filed by *Arthur J. Mandell* for the American Trial Lawyers Association, and by *Abraham E. Freedman* for the National Maritime Union of America.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a suit under the Jones Act[1] by a seaman who was injured aboard the ship *Hellenic Hero* in the Port of New Orleans. The District Court, sitting without a jury, rendered judgment for the seaman, 273 F. Supp. 248. The Court of Appeals affirmed, 412 F. 2d 919. The case is here on petition for a writ of certiorari which we granted, 396 U. S. 1000, in light of the conflict between the decision below and *Tsakonites* v. *Transpacific Carriers Corp.*, 368 F. 2d 426, in the Second Circuit.

Petitioner[2] Hellenic Lines Ltd. is a Greek corporation that has its largest office in New York and another office in New Orleans. More than 95% of its stock[3] is owned by a United States domiciliary who is a Greek citizen—Pericles G. Callimanopoulos (whom we call Pericles). He lives in Connecticut and manages the corporation out of New York. He has lived in this coun-

[1] The Act provides:

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located." 41 Stat. 1007, 46 U. S. C. § 688.

[2] The other petitioner, Universal Cargo Carriers Inc., is a Panamanian corporation which owns the *Hellenic Hero;* but *Hellenic Hero* is managed by petitioner Hellenic Lines Ltd., a Greek corporation.

[3] Pericles owns in excess of 95% of the stock of both petitioners.

try since 1945. The ship *Hellenic Hero* is engaged in regularly scheduled runs between various ports of the United States and the Middle East, Pakistan, and India. The District Court found that its entire income is from cargo either originating or terminating in the United States.

Respondent, the seaman, signed on in Greece, and he is a Greek citizen. His contract of employment provides that Greek law and a Greek collective-bargaining agreement apply between the employer and the seaman and that all claims arising out of the employment contract are to be adjudicated by a Greek court. And it seems to be conceded that respondent could obtain relief through Greek courts, if he desired.

The Jones Act speaks only of "the defendant employer" without any qualifications. In *Lauritzen* v. *Larsen,* 345 U. S. 571, however, we listed seven factors to be considered in determining whether a particular shipowner should be held to be an "employer" for Jones Act purposes:

> (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured seaman; (4) allegiance of the defendant shipowner; (5) the place where the contract of employment was made; (6) the inaccessibility of a foreign forum; and (7) the law of the forum.

Of these seven factors it is urged that four are in favor of the shipowner and against jurisdiction: the ship's flag is Greek; the injured seaman is Greek; the employment contract is Greek; and there is a foreign forum available to the injured seaman.

The *Lauritzen* test, however, is not a mechanical one. 345 U. S., at 582. We indicated that the flag that a ship flies may, at times, alone be sufficient. *Id.,* at 585–586.

The significance of one or more factors must be considered in light of the national interest served by the assertion of Jones Act jurisdiction.[4] Moreover, the list of seven factors in *Lauritzen* was not intended as exhaustive. As held in *Pavlou* v. *Ocean Traders Marine Corp.*, 211 F. Supp. 320, 325, and approved by the Court of Appeals in the present case, 412 F. 2d, at 923 n. 7, the shipowner's *base of operations* is another factor of importance in determining whether the Jones Act is applicable; and there well may be others.

In *Lauritzen* the injured seaman had been hired in and was returned to the United States, and the shipowner was served here. Those were the only contacts of that shipping operation with this country.

The present case is quite different.

Pericles became a lawful permanent resident alien in 1952. We extend to such an alien the same constitutional protections of due process that we accord citizens.[5]

---

[4] Judge Medina, speaking for the Court of Appeals for the Second Circuit, correctly stated the problem in the following words:

"[T]he decisional process of arriving at a conclusion on the subject of the application of the Jones Act involves the ascertainment of the facts or groups of facts which constitute contacts between the transaction involved in the case and the United States, and then deciding whether or not they are substantial. Thus each factor is to be 'weighed' and 'evaluated' only to the end that, after each factor has been given consideration, a rational and satisfactory conclusion may be arrived at on the question of whether all the factors present add up to the necessary substantiality. Moreover, each factor, or contact, or group of facts must be tested in the light of the underlying objective, which is to effectuate the liberal purposes of the Jones Act." *Bartholomew* v. *Universe Tankships, Inc.*, 263 F. 2d 437, 441.

[5] "The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our

*Kwong Hai Chew* v. *Colding*, 344 U. S. 590, 596. The injury occurred here. The forum is a United States court. Pericles' base of operations is New York. The *Hellenic Hero* was not a casual visitor; rather, it and many of its sister ships were earning income from cargo originating or terminating here. We see no reason whatsoever to give the Jones Act a strained construction so that this alien owner, engaged in an extensive business operation in this country, may have an advantage over citizens engaged in the same business by allowing him to escape the obligations and responsibility of a Jones Act "employer." The flag, the nationality of the seaman, the fact that his employment contract was Greek, and that he might be compensated there are in the totality of the circumstances of this case minor weights in the scales compared with the substantial and continuing contacts that this alien owner has with this country. If, as stated in *Bartholomew* v. *Universe Tankships Inc.*, 263 F. 2d 437, the liberal purposes of the Jones Act are to be effectuated, the facade of the operation must be considered as minor, compared with the real nature of the operation and a cold objective look at the actual operational contacts that this ship and this owner have with the United States. By that test the Court of Appeals was clearly right in holding that petitioner Hellenic Lines was an "employer" under the Jones Act.

*Affirmed.*

---

borders. Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment. None of these provisions acknowledges any distinction between citizens and resident aliens. They extend their inalienable privileges to all 'persons' and guard against any encroachment on those rights by federal or state authority." *Bridges* v. *Wixon*, 326 U. S. 135, 161 (concurring opinion).

MR. JUSTICE HARLAN, with whom THE CHIEF JUSTICE and MR. JUSTICE STEWART join, dissenting.

I dissent from today's decision holding that a Greek seaman who signs articles in Greece for employment on a Greek-owned, Greek-flag vessel may recover under the Jones Act for shipboard injuries sustained while the vessel was in American territorial waters. This result is supported neither by precedent, nor realistic policy, and in my opinion is far removed from any intention that can reasonably be ascribed to Congress.

A

Section 688 of Title 46, U. S. C., 41 Stat.. 1007, the Jones Act, provides:

> "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located."

The language of § 688 is, as Mr. Justice Jackson noted in *Lauritzen* v. *Larsen,* 345 U. S. 571 (1953), all-embracing. By its terms it is not limited to American

seamen nor to vessels bearing the American flag. Yet despite the sweeping language it can hardly be doubted that congressional concern stopped short of the lengths to which the literal terms of the statute carry the Jones Act. This was emphasized in *Lauritzen* which pointed out that Congress wrote against a backdrop of "usage as old as the Nation," that "such statutes have been construed to apply only to areas and transactions in which American law would be considered operative under prevalent doctrines of international law." 345 U. S., at 577. This principle the Court reiterated in *Romero* v. *International Terminal Co.,* 358 U. S. 354 (1959), where we reaffirmed the presumption that domestic legislation has been enacted with "respect for the relevant interests of foreign nations in the regulation of maritime commerce as part of the legitimate concern of the international community." 358 U. S., at 383.

This Court only recently applied this principle in *McCulloch* v. *Sociedad Nacional,* 372 U. S. 10 (1963), where we were called upon to determine whether labor relations dealing with an alien crew on a foreign-flag vessel, beneficially owned by an American corporation, affected "commerce" within the meaning of the National Labor Relations Act. In holding that the Act was not "intended to have any application to foreign registered vessels employing alien seamen," the Court declined to rely on the beneficial ownership of the vessel and other "substantial United States contacts," including regular visits to the United States and the "integrated maritime operation" of the United Fruit Company, the beneficial owner of the vessel, to override the well-settled principle that the law of the country whose flag a ship flies governs shipboard transactions, absent some "clear expression" from Congress to the contrary. See *Wildenhus's Case,* 120 U. S. 1 (1887); *United States* v. *Flores,* 289 U. S. 137, 155–159 (1933); *Cunard Steamship Co.* v. *Mellon,*

262 U. S. 100, 124 (1923); cf. *Murray* v. *The Charming Betsy,* 2 Cranch 64, 118 (1804).[1]

The *McCulloch* case followed a course marked early in our jurisprudence, and, in fact, built upon *Lauritzen* which had announced that the law of the flag, "the most venerable and universal rule of maritime law," would in Jones Act cases "overbear most other connecting events in determining applicable law . . . unless some heavy counterweight appears." 345 U. S., at 584, 585–586.

Such a counterweight would exist only in circumstances where the application of the American rule of law would further the purpose of Congress. While some legislation in its purpose obviously requires extension beyond our borders to achieve national policy, this is not so, in my opinion, with an Act concerned with prescribing particular remedies, rather than one regulating commerce or creating a standard for conduct.

The only justification that I can see for extending extraterritorially a remedial-type provision like § 688

---

[1] The principle of deference to the law of the flag had its origins in the fiction that the vessel was an extension of the sovereign territory of the country whose ensign it flew. As Mr. Justice Jackson noted in *Lauritzen,* the principle draws strength from the practical necessity of providing predictable rules for shipboard conduct, rules that would, under conventional territorial principles, be changing as the vessel traveled over the high seas and through different territorial waters. "It is true that the criminal jurisdiction of the United States is in general based on the territorial principle, and criminal statutes of the United States are not by implication given an extra-territorial effect. [Citations omitted.] But that principle has never been thought to be applicable to a merchant vessel which, for purposes of the jurisdiction of the courts of the sovereignty whose flag it flies to punish crimes committed upon it, is deemed to be a part of the territory of that sovereignty, and not to lose that character when in navigable waters within the territorial limits of another sovereignty. . . ." *United States* v. *Flores,* 289 U. S., at 155–156. See Restatement, Conflict of Laws §§ 405, 406 (1934).

is that the injured seaman is an individual whose well-being is a concern of this country. It was for this reason that *Lauritzen* recognized the residence of the plaintiff as a factor that should properly be considered in deciding who is a "seaman" as Congress employed that term in § 688. See D. Cavers, The Choice-of-Law Process 96–97 (1965). In so doing it reflected earlier decisions where recovery was had by resident alien seamen who were serving aboard foreign-flag vessels. See, *e. g., Gambera* v. *Bergoty,* 132 F. 2d 414 (C. A. 2d Cir. 1942); cf. *Uravic* v. *F. Jarka Co.,* 282 U. S. 234 (1931).

In the early decisions involving citizen and resident alien seamen serving on foreign vessels, some additional factor, such as the vessel's presence in American waters or beneficial American ownership, was considered to be an element justifying recovery. See *Uravic* v. *F. Jarka Co., supra; Gerradin* v. *United Fruit Co.,* 60 F. 2d 927 (C. A. 2d Cir. 1932); compare *Gambera* v. *Bergoty, supra,* with *O'Neill* v. *Cunard White Star,* 160 F. 2d 446 (C. A. 2d Cir. 1947). *Lauritzen* in enumerating these factors ("contacts") as independent considerations, was attempting to focus analysis on those factors that are the necessary ingredients for a statutory cause of action: first, as a matter of statutory construction, is plaintiff within that class of seamen that Congress intended to cover by the statute? and, second, is there a sufficient nexus between the defendant and this country so as to justify the assertion of legislative jurisdiction? [2] In other words the Court must define "seaman" and "employer" as those words are used in

---

[2] There must be at least some minimal contact between a State and the regulated subject before it can, consistently with the requirements of due process, exercise legislative jurisdiction. See, *e. g., Home Ins. Co.* v. *Dick,* 281 U. S. 397 (1930); *Watson* v. *Employers Liability Assurance Corp.,* 348 U. S. 66 (1954).

§ 688.  In this regard the *situs* of the accident or the vessel's contacts with this country by virtue of its beneficial ownership or the frequency of calls at our ports simply serves as an adequate nexus between this country and defendant to assert jurisdiction in a case where congressional policy is otherwise furthered.  But no matter how qualitatively substantial or numerous these kinds of contacts may be, they have no bearing in themselves on whether Jones Act recovery is appropriate in a given instance.  For transactions occurring aboard foreign-flag vessels that question should be answered by reference to the plaintiff's relationship to this country.  See Note, Admiralty and the Choice of Law: *Lauritzen* v. *Larsen* Applied, 47 Va. L. Rev. 1400 (1961).

Viewed in this perspective, today's decision and decisions of several lower courts that have taken the phenomenon of "convenient" foreign registry as a wedge for displacing the law of the flag, see, *e. g., Southern Cross Steamship Co.* v. *Firipis,* 285 F. 2d 651 (C. A. 4th Cir. 1960); *Pavlou* v. *Ocean Traders Marine Corp.,* 211 F. Supp. 320 (D. C. S. D. N. Y. 1962); *Voyiatzis* v. *National Shipping & Trading Corp.,* 199 F. Supp. 920 (D. C. S. D. N. Y. 1961), have, I believe, misconstrued these basic premises on which *Lauritzen* was founded.  This is underscored by the fact that the *Lauritzen* allusion to the practice of American owners of finding a "convenient" flag "to avoid stringent shipping laws by seeking foreign registration eagerly offered by some countries," 345 U. S., at 587, was prefaced by citation and discussion of *Skiriotes* v. *Florida,* 313 U. S. 69 (1941), and *Steele* v. *Bulova Watch Co.,* 344 U. S. 280 (1952), both of which dealt with the question of when legislative jurisdiction existed to apply domestic law to American nationals abroad.  In both cases the application of domestic law

presupposed or construed legislative purpose to be furthered by reaching across the border.[3]

The *Lauritzen* statement, lifted out of context, has acquired a dynamism and become the justification for recovery by foreign seamen simply on the ground that convenient "registry" somehow circumvents an obligation that Congress desired to impose on all owners within its jurisdiction.[4]

---

[3] In *Skiriotes* the precise question was whether a State could prohibit by statute the use of diving equipment for the purpose of gathering deep sea sponges in waters within its territorial limits. This Court sustained the State's legislative jurisdiction to regulate the conduct of its own citizens. Thus the Court said: "Even if it were assumed that the *locus* of the offense was outside the territorial waters of Florida, it would not follow that the State could not prohibit its own citizens from the use of the . . . divers' equipment at that place. No question as to the authority of the United States over these waters, or over the sponge fishery, is here involved. No right of a citizen of another State is here asserted. The question is solely between appellant and his own State. . . . If the United States may control the conduct of its citizens upon the high seas, we see no reason why the State of Florida may not likewise govern the conduct of its citizens upon the high seas with respect to matters in which the State has a legitimate interest . . . ." 313 U. S., at 76–77.

*Steele* involved the question of whether a district court "has jurisdiction to award relief to an American corporation against acts of trade-mark infringement and unfair competition consummated in a foreign country by a citizen and resident of the United States." 344 U. S., at 281. There was no question that plaintiff had suffered the injury and American commerce had been adversely affected in the way that the Lanham Act sought to prevent. The court concluded that in such circumstances liability could not be avoided simply by performing the forbidden acts in a foreign territory. Cf. *Continental Ore Co.* v. *Union Carbide,* 370 U. S. 690, 704 (1962); *United States* v. *Sisal Sales Corp.,* 274 U. S. 268 (1927).

[4] The Second Circuit quite properly relied on the beneficial ownership of the ship to permit recovery in *Bartholomew* v. *Universe Tankships, Inc.,* 263 F. 2d 437 (C. A. 2d Cir. 1959), where the

This underlies today's decision which relies on the fact that Hellenic Lines is an American-based operation and its vessels would be accorded a competitive advantage over American-flag vessels were we to permit petitioners to avoid responsibility under the Jones Act. Liability is only one factor that contributes to the higher cost of operating an American-flag vessel. Indeed, recognizing the insurance factor, it is doubtful that this factor is a significant contribution to the competitive advantage of foreign-flag ships, especially given the higher crew wages (see 46 U. S. C. § 1132 requiring American crews) and construction costs for American-flag ships, which must be built in American yards if they are to participate in the congressional programs specifically designed to offset the higher costs that the Court today takes as justification for displacing settled international principles of choice of law. See, *e. g.*, 46 U. S. C. § 883 (coastwise trade); 46 U. S. C. § 1180 (subsidy). See generally S. Lawrence, United States Merchant Shipping Policies and Politics 61–67 (1966).

Even were Jones Act liability a significant uncompensated cost in the operation of an American ship, I could not regard this as a reason for extending Jones Act recovery to foreign seamen when the underlying concern of the legislation before us is the adjustment of the risk of loss between individuals and not the regulation of commerce or competition.

_____

injured plaintiff was an American domiciliary. *Bartholomew*, unfortunately, apprehended what I conceive to be unintended reverberations in Justice Jackson's *Lauritzen* language which it all but echoed: "looking through the facade of foreign registration and incorporation to the American ownership . . . is essential unless the purposes of the Jones Act are to be frustrated by American shipowners intent upon evading their obligations under the law by the simple expedient of incorporating in a foreign country and registering their vessels under a foreign flag." 263 F. 2d 437, 442.

## B

Today's decision suggests that courts have become mesmerized by contacts, and notwithstanding the purported eschewal of a mechanical application of the *Lauritzen* test, they have lost sight of the primary purpose of *Lauritzen* which, as I conceive it, was to reconcile the all-embracing language of the Jones Act with those principles of comity embodied in international and maritime law that are designed to "foster amicable and workable commercial relations." 345 U. S., at 582. *Lauritzen,* properly understood, should, I submit, be taken to focus the judicial inquiry on the purpose of Congress and the presence or absence of an adequate basis for the assertion of American jurisdiction, when that purpose may be furthered by application of the statute in the circumstances presented.

Where, as in the case before us, the injured plaintiff has no American ties, the inquiry should be directed toward determining what jurisdiction is primarily concerned with plaintiff's welfare and whether that jurisdiction's rule may, consistent with those notions of due process that determine the presence of legislative jurisdiction, govern recovery. In the case before us, there is no reason to disregard either the law of the flag or plaintiff's contractual undertaking to accept Greek law as controlling, thereby in effect assuming that he signed articles under conditions that would justify disregarding the contractual choice of law. Rhoditis is a Greek national who resides in Greece. Under these circumstances Greek law provides the appropriate rule.

I would reverse the judgment of the Court of Appeals, and hold that the Jones Act affords no redress to this seaman.