## Nathaniel CRUZ, Plaintiff,

v.

## MARITIME COMPANY OF PHILIPPINES, Defendant.

### No. 80 Civ. 6599 (PNL).

United States District Court, S. D. New York.

Oct. 12, 1982.

---

Florrie L. Wertheimer, New York City, for plaintiff.

John R. Geraghty, Healy & Baillie, New York City, for defendant.

## OPINION AND ORDER

LEVAL, District Judge.

This is an action by a seaman to recover damages for personal injuries sustained while serving aboard a vessel owned and operated by the defendant. Defendant moves to dismiss on the ground of forum non conveniens. The motion is granted.

*Facts and Allegations*

Plaintiff Nathaniel Cruz is a citizen, and on the date of the injury was a resident of the Philippines. At the time of his injury,

he was a seaman on a Philippine vessel, passing through United States waters. He has lived in the United States since that date and now claims to be a resident of the United States, having applied for political asylum in this country. Defendant Maritime Company of the Philippines ("MCP") is a Philippine corporation, having its principal place of business in the Philippines. MCP is owned by shareholders all of whom are citizens and residents of the Philippines. All of MCP's directors and four of its five officers are citizens and residents of the Philippines. The fifth officer, a vice president and general manager, is a permanent resident of the Philippines but a citizen of the United States.

Plaintiff entered into an oral agreement with defendant in the Philippines to serve as a seaman aboard the M. V. Zamboanga, a Philippine flag vessel owned and operated by MCP. The Zamboanga carried a crew of Philippine citizens and residents, all of whom were engaged by MCP in the Philippines.

In 1980, MCP owned seven vessels, including the Zamboanga, and operated thirteen other vessels pursuant to bareboat charters. MCP controlled the routing of all of its vessels from its office in the Philippines. In addition, MCP hired its crews, handled its vessels' accountings and paid most of its vessels' expenses from its office in the Philippines. MCP engaged a partially owned subsidiary, North American Maritime Agencies ("NAMA"), to act as its agent in the United States to assist it in soliciting American cargo and to act as a liaison with MCP's American customers. NAMA performs several functions for MCP, including arranging for U. S. stevedoring, collecting and accounting for freights payable in the United States, appointing husbanding agents, and paying routine expenses when payable in the United States. NAMA accounts to MCP at least every ten days for monies received by it on account of MCP freights and receives a percentage of MCP's United States freights as its agency fee. NAMA is an American agent for six shipping lines in addition to MCP and performs similar functions for each. A full time employee of MCP serves as MCP's "local representative in New York" (Deft's Reply Brief p. 6) and maintains an office in NAMA's suite of offices. MCP derives approximately 29% of its worldwide operating revenues from its United States operations.[1]

On November 12, 1980, several members of the Zamboanga's crew were removing the cover from one of the ship's hatches. In the course of that operation, the cover struck plaintiff in the leg. At the time, the ship was moored in the port of Camden, New Jersey. Six crewmembers are known to have been witnesses to the accident. Plaintiff claims that Edward R. Aziz (an American employee of NAMA), Harry Finnegan (the port captain) and unidentified longshoremen were witnesses to the accident. Defendant claims that Aziz denies having witnessed the accident. No affidavits of such persons have been submitted attesting to any knowledge of the accident.

After the accident, plaintiff was taken by ambulance to a hospital in Camden, New Jersey, where he remained as an inpatient until January 1981. At that time, he was advised that he would soon be repatriated to the Philippines for further treatment, whereupon he signed himself out of the hospital. Plaintiff claims that he took this action because he had been told he would be returned to the Philippines by boat and didn't believe that he could survive such a trip. Defendant claims that it advised plaintiff that he would be returned to the Philippines by air. In any event, plaintiff later admitted himself to the Hospital for Joint Diseases and Orthopaedic Institute where he continued to receive medical attention. On May 7, 1981, his leg was amputated above the knee. Since that time, plaintiff has obtained a prosthesis and has continued to receive medical care. To date,

---

1. It is not clear whether this is a gross or a net figure. The parties have submitted contradictory documentary evidence. It is not necessary for purposes of this motion to determine which is correct.

he has incurred medical expenses in this country of at least $158,251.47.

*Discussion*

■ Plaintiff asserts that the Jones Act, 46 U.S.C. § 688, and the general maritime law of the United States govern this case. Defendant asserts that the law of the Philippines applies. If the Jones Act and the general maritime law of the United States apply, then the court is without power to dismiss on grounds of forum non conveniens. *Antypas v. Cia. Maritime San Basilio, S.A.,* 541 F.2d 307, 310 (2nd Cir. 1976). If on the other hand, Philippine law applies, then the court is required to exercise its discretion to determine whether or not the matter should be dismissed and the parties directed to litigate in a different forum. I conclude that Philippine law applies.

*Choice of Law*

In *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), the Supreme Court identified seven factors that bear on the choice of law in cases of maritime torts, namely the place of the wrongful act; the law of the ship's flag; the allegiance or domicile of the injured seaman; the allegiance of the shipowner; the place where the contract of employment was made; the inaccessability of a foreign forum; and the law of the forum. The Court noted in *Hellenic Lines Limited v. Rhoditis,* 398 U.S. 306, 308–09, 90 S.Ct. 1731, 1734, 26 L.Ed.2d 252 (1970), that the *Lauritzen* list was not intended as exhaustive. "[T]he shipowner's *base of operations* is another factor of importance in determining whether the Jones Act is applicable; and there may be others." The Court also cautioned that the test is not a mechanical one and that the significance of each factor must be considered in light of the national interest served by the assertion of Jones Act jurisdiction. The significant factors in this case point to the application of Philippine law.

The fact that plaintiff was injured on American waters provides some support for his contention that American law should apply, but it should not be given great weight. "The test of location of the wrong-ful act or omission, however sufficient for torts ashore, is of limited application to shipboard torts, because of the varieties of legal authority over waters she may navigate." *Lauritzen v. Larsen,* 345 U.S. at 583, 73 S.Ct. at 929.

■ It is more significant that the Zamboanga sailed under the flag of the Philippines. Maritime torts are ordinarily governed by the law of the ship's flag because of the practical necessity that a single unvarying legal standard govern shipboard life. *Lauritzen v. Larsen,* 345 U.S. at 585, 73 S.Ct. at 930. See *Romero v. International Terminal Operating Co.,* 358 U.S. 354 at 384, 79 S.Ct. 468 at 486, 3 L.Ed.2d 769 ("The amount and type of recovery which a foreign seaman may receive from his foreign employer while sailing on a foreign ship should not depend on the wholly fortuitous circumstance of the place of injury."). For this reason, the courts of this country apply the law of the flag to maritime torts unless some heavy counterweight appears. In this case there is none.

■ Also significant is that plaintiff is a citizen of the Philippines and at the time of the accident was a resident of the Philippines, who entered into defendant's employ in the Philippines. His claim to have established a residence in this country since that time has no bearing on the choice of law. See *Nunez-Lozano v. Rederi,* 634 F.2d 135, 137 (5th Cir. 1980); *Frangiskatos v. Liberian M/V Konkar Pioneer,* 471 F.2d 714 (2nd Cir. 1972).

Defendant is a Philippine corporation, owned entirely by Philippine nationals. It is not a foreign shell created by American interests to avoid the requirements of American law. *Cf. Hellenic Lines v. Rhoditis,* 398 U.S. 306, 310, 90 S.Ct. 1731, 1734, 26 L.Ed.2d 252 (1970), in which a foreign corporation substantially owned by an American resident was subjected to the Jones Act. Defendant does not derive substantially all of its income from American shipping, nor does it have a principal base of operations in this country. As plaintiff concedes, defendant's principal base of operations is in

the Philippines. *See* Plaintiff's Attorney's Affidavit at 1. That is the place from which defendant controls the routing of its vessels, hires its crews, handles its vessels' accountings and pays most of its vessels' expenses. Defendant's maintenance of a single full-time employee in the United States and its reliance on the services in the United States of a partially owned freight agent does not require application of American law to this case. *See Koupetoris v. Konkar Intrepid Corp.,* 535 F.2d 1392 (2d Cir. 1976). If it did, virtually all foreign shipowners whose vessels sail to and from American ports would find themselves subject to this nation's maritime tort laws.

I conclude that this forum has no interest in applying its law to this case and that the significant factors point overwhelmingly to the application of Philippine law. *See Lauritzen v. Larsen.*

*Forum Non Conveniens*

■ There is ordinarily a strong presumption that a plaintiff's choice of forum should not be disturbed unless an alternative forum has jurisdiction to hear the case and the private interests of the litigants and the public interests of the forum clearly point towards trial in the alternative forum. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 242, 255, 102 S.Ct. 252, 258, 265, 70 L.Ed.2d 419 (1981). This presumption carries less force when the plaintiff is foreign. *Id.,* 102 S.Ct. at 265. This is one of the rare cases in which the presumption has been overcome.

■ An alternative forum exists in the Philippines before which the litigants can try this case. Plaintiff's experts on Philippine law conclude that the Philippine courts have jurisdiction to hear the case; defendant's expert concludes that the Philippine

National Seamen Board has jurisdiction. For these purposes, it is enough that all agree that at least one Philippine forum has authority to adjudicate the case. Defendant has agreed to appear in an action commenced by plaintiff in the Philippines and to waive in any such action any defenses based on applicable statutes of limitations or laches.

Plaintiff contends he will be denied access to a Philippine forum and cannot obtain a fair trial in the Philippines because he is known to be an opponent of the Marcos regime. He has failed to substantiate that contention. He shows only that he first joined the Movement for a Free Philippines while lying in a United States hospital bed, recuperating from the injuries he suffered aboard the Zamboanga. He has submitted no evidence, other than his naked assertion, that the Philippines will not make a fair forum available to him. Indeed, plaintiff's three experts on Philippine law assume that plaintiff is a member of the Movement for a Free Philippines and a bona fide activist but do not state that the Philippines would deny plaintiff access to, or a just adjudication in, a Philippine tribunal.[2]

Although the aggregate interests of the litigants do not weigh heavily in favor of either of the available forums, the interests of the public and the forum overwhelmingly favor dismissal of this United States action, in favor of a Philippine action.

Whichever the forum, certain witnesses might not be easily available. It appears likely that some sources of proof will be more accessible in the United States than in the Philippines while other sources of proof

---

**2.** Roberto Concepcion concluded that plaintiff might find it safer to litigate in New York, "considering his alleged political opinions." Concepcion affidavit at 10. That conclusion, however, has nothing to do with the availability or fairness of a Philippine forum. I attach little weight to it, especially in light of the fact that the record does not demonstrate that plaintiff would have to be physically present in the Philippines to assert his claim.

    Ernesto Maceda made no conclusion as to the effect that plaintiff's alleged political beliefs

would have on the availability or fairness of a Philippine tribunal.

    Norberto Quisumbing noted that plaintiff "has applied for political asylum in New York for fear of persecution if he were to return to the Philippines because of his political opinions against the Marcos regime," Quisumbing affidavit at 3, but did not conclude that this would affect plaintiff's ability to litigate his claim in the Philippines before an impartial tribunal.

will be more accessible in the Philippines. The six Philippine crewmen who the parties agree witnessed the accident are more likely to be available to testify in the Philippines than in New York (although it is possible that either forum would be required to take their testimony by deposition).[3] Plaintiff was treated by doctors in New Jersey and New York. Some of these American medical witnesses might have an incentive to cooperate in a Philippine proceeding even though are beyond the reach of a Philippine subpoena because they have liens against the plaintiff that are likely to be unsatisfied unless the plaintiff recovers damages from the defendant. *See* plaintiff's brief at 19. The Philippine witnesses to the accident, however, have no apparent reason to go out of their way to cooperate before this court if they are beyond the reach of its subpoenae. The parties have not indicated the extent to which Philippine procedure would be satisfied by deposition testimony of the doctors. I conclude that the individual interests of the parties do not conclusively establish the preferability of either forum.

However, I conclude that the public interest of the United States, the interests of this forum, and the public interest of the Philippines all indicate the dismissal of the United States action in favor of a Philippine action.

The United States has no substantial connection with this litigation other than the mere fortuity that plaintiff's vessel was in a United States port at the time he was injured and that plaintiff has remained in this country since that time. The United States has no interest in adjudicating employment disputes between Philippine employers and Philippine employees. To the contrary, our courts "are already extremely attractive to foreign plaintiffs [and] would become even more attractive" if they did not decline to adjudicate essentially foreign litigation. "The flow of litigation into the United States would increase and further

congest already crowded courts." *Piper Aircraft Co. v. Renyo*, 454 U.S. 235, 252, 102 S.Ct. 252, 263–64, 70 L.Ed.2d 419 (1981). As Judge Weinfeld has noted:

The doctrine of forum non conveniens protects not only the immediate defendant from harassing and vexatious litigation, but also other litigants and the community at large from unwarranted imposition upon the local courts' jurisdiction.

*Noto v. Cia Secula di Armanento*, 310 F.Supp. 639, 649 (S.D.N.Y.1970). Our courts' ability to discharge their obligations to give speedy justice in matters properly before them would be substantially impaired to the prejudice of all if they took it upon themselves also to resolve the disputes of the rest of the world.

Moreover, it is of questionable propriety to impose on the citizens of this country the duty as jurors to resolve a foreign controversy. "Jury duty [however] is a burden that ought not to be imposed upon the people of a community which has no [substantial] relation to the litigation." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947).

Finally, adjudication of this case in the United States courts would require resolution of complex questions of Philippine law. It would first be necessary to decide which Philippine forum would have jurisdiction to hear this case if it had been brought in the Philippines and then, what substantive law that forum would apply to the facts of this case. These are difficult questions. Plaintiff's and defendant's legal experts have been unable to agree on their resolution. No good reason appears in this suit between a Philippine seaman and a Philippine company involving an injury incurred aboard a Philippine ship why the United States court should be the one to make these interpretations of Philippine law.

In contrast to the negative interest of the United States forum and public in the resolution of this dispute, the Philippines have a distinct interest in seeing to the resolution

---

**3.** Plaintiff claims, but has not demonstrated, that two named and several unnamed American residents witnessed the accident. He has submitted no affidavits, and defendant claims that at least one of the named Americans specifically denies having witnessed the accident.

of such a Philippine employment dispute. This is no less so by reason of the fact that the work site was a ship engaged in international trade. Plaintiff's contention that the Philippine forum would refer to United States law (which defendant disputes) does not argue otherwise. The fact remains of the Philippine public interest in the resolution of a Philippine employment dispute according to whatever rules Philippine law makes appropriate.

The action is hereby ordered dismissed. Plaintiff may apply for reinstatement of the action upon a showing that it has not been possible to assert jurisdiction over the defendant in an appropriate forum of the Philippines.

SO ORDERED.