851 So.2d 731 (2003)
Esmond HENRY, Appellant,
v.
WINDJAMMER BAREFOOT CRUISES, etc., et al., Appellees.
No. 3D02-93.
District Court of Appeal of Florida, Third District.
May 21, 2003.
Rehearing and Rehearing Denied August 13, 2003.
*732 Sweetapple, Broeker, Varkas & Feltman, and Paul B. Feltman, for appellant.
Houck, Hamilton & Anderson, Jerry Hamilton, and Jennifer Quildon Miller, Miami, and Gregory A. Reed, for appellees.
Before COPE, GODERICH and RAMIREZ, JJ.
Rehearing and Rehearing En Banc Denied August 13, 2003.
PER CURIAM.
The plaintiff, Esmond Henry, appeals from an order granting final summary judgment in favor of Windjammer Barefoot Cruises [WBC] and International Maritime Resources, Inc. [IMR]. Henry also appeals from an order granting the defendants' motion to dismiss finding that Henry failed to establish subject matter jurisdiction under the Jones Act, 46 U.S.C. app. 688 and general maritime law. We reverse and remand for further proceedings.
Henry slipped and fell on the deck of the vessel S/V Polynesia. Henry brought this action against IMR, WBC, and Polynesia seeking damages for Jones Act negligence, unseaworthiness, and failure to provide maintenance and cure.
The trial court limited discovery to matters concerning forum non conveniens and subject matter jurisdiction. The trial court denied the motion to dismiss for forum non conveniens. Thereafter, the defendants filed a motion to dismiss alleging that the trial court lacked subject matter jurisdiction based on the factors set forth in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), and Hellenic Lines, Ltd. v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). WBC and IMS also filed a motion for summary judgment.
The trial court held hearings on the motions. The discovery presented at the hearing reflects that Henry signed his employment contract while aboard the S/V Polynesian in St. Maarten, and that pursuant to his employment contract, he was "governed by the Laws of the Government into which jurisdiction the vessel shall sail." The discovery further reflected that the home port of the S/V Polynesia was Philipsburg, St. Maarten; the S/V Polynesia is a Honduran flagged vessel; the S/V Polynesia was owned by Polynesia, a Panamanian corporation; the accident occurred while the S/V Polynesia was in the waters of Philipsburg, St. Maarten; the S/V Polynesia has never called on ports in the United States; Henry is a Guyana national; following his accident, Henry was treated in St. Maarten, Guyana, and Jamaica; and Polynesia's sole asset is the S/V Polynesia.
In opposing the motions, Henry presented evidence indicating that the S/V Polynesia is a member of the Windjammer Fleet, which is operated by several Florida corporations all based at the same Miami Beach office. The Windjammer corporations are owned and run by Captain Michael Burke and/or his six children. Further, Polynesia is a Panamanian corporation whose Director/Treasurer is Robert Rios Osorio. Mr. Osorio is also the Director/Treasurer of another Panamanian company, Gerente de Barcos. This company maintains a bank account in South Florida. Evidence was presented indicating that Burke family companies utilize the funds in that account and that funds in that account are also utilized to reimburse Polynesia for expenses.
The affidavit of IMR's ex-Human Resource Coordinator was submitted and *733 averred that the S/V Polynesia was part of the Windjammer Fleet; IMR, WBC, and Polynesia were in reality one and the same, that they operated out of the same office in Miami Beach, and that the monies and assets of these companies were comingled; all vessels, including the S/V Polynesia, were controlled by the Burke family from the Miami Beach office; the Burke family practice was to withdraw money from the "Gerente de Barcos" account and have a courier deliver the money to various vessels to pay crew members; crew members were treated as employees of the Windjammer Fleet and were freely moved from ship to ship, but this practice ended after Mr. Henry's accident; prior to Mr. Henry's accident, all crew member employment files were kept at the Miami Beach office; and the captains of each vessel reported solely to the Burke family. In a deposition given in another case, this ex-employee stated that in 1998, WBC wanted to go public, and therefore, an audit was performed. The audit revealed that the true owner of the Panamanian corporations was Captain Burke. As a result, a $20,000,000 fine was assessed by the Internal Revenue Service.
The deposition of Mike Burke, who is Captain Burke's son, was submitted. He testified that he is the sole shareholder of IMR. IMR is an agent for Windjammer, Inc., a Panamanian company. As Supervisor of Human Resource Management for IMR, he advertises and solicits crew members for the Windjammer fleet of vessels. Payroll records for crews of the various ships are also kept at IMR's Miami Beach office. IMR is compensated from the Gerente de Barcos account for business with Polynesia.
Following the hearings, the trial court granted the motions. Henry's motion for reconsideration was denied. This appeal follows.
The issues presented in this appeal have been addressed by the Eleventh Circuit in Fantome, S.A. v. Frederick, No. 02-10890, 2003 WL 215812, ___ So.2d ____ (11th Cir. Jan.24, 2003), which was not available to the trial court at the time of its decision. Rather than repeat the well-reasoned analysis contained therein, we adopt the unpublished opinion of the Eleventh Circuit as the opinion of this Court. Accordingly, we reverse the orders under review and remand for further proceedings. The Fantome opinion recites as follows:
Sarah Frederick and other claimants appeal the district court's order dismissing their action on forum non conveniens grounds. The district court concluded that United States law was inapplicable to the action and then determined that Panama, rather than the district court in Florida, was the appropriate forum. As we find that United States law is applicable to the action, we reverse.
BACKGROUND
The S/V FANTOME was a 282-foot schooner, which operated as a cruise ship in the Caribbean. It was one of seven vessels comprising the Windjammer Fleet, which is owned entirely by Captain Michael Burke and his six children. Each ship within the fleet is owned by a separate foreign corporation bearing its name. At the time of the FANTOME's disappearance, it was owned by Fantome, S.A., a Panamanian corporation, and was flagged under the laws of Equatorial Guinea. Burke, a Miami Beach resident, was the principal shareholder of Fantome. Burke's son, Michael D. Burke, is the president of International Maritime Resources, Inc. (IMR), the operating agent of the Windjammer Fleet. IMR was responsible for facilitating the operations of the FANTOME, as well as the other vessels in *734 the fleet. The fleet's advertising, reservations, and sales were handled by Windjammer Barefoot Cruises, Ltd. Both of these entities operate out of and are located in Miami Beach, Florida.
As was the case with each of the vessels in the Windjammer Fleet, the FANTOME never entered a United States port. The ship's home port was in Honduras, and it had ports of call at various locations in the Caribbean, where all of the FANTOME's day-to-day operations and repairs took place. Windjammer's Miami Beach headquarters communicated with the FANTOME and the rest of the Windjammer Fleet via satellite phone, facsimile, and computer. The ship's crew members were hired in various foreign ports, and their contracts were signed and kept on the ship.
In late October of 1998, as the ship set sail, Hurricane Mitch, a late-season Category Five hurricane, was forming in the Atlantic Ocean. When the Windjammer headquarters in Miami Beach informed the FANTOME's captain that the hurricane was approaching the ship, a decision was made to sail to Belize and discharge all passengers and nonessential crew members. After the passengers and crew members were discharged, the ship sailed east in an attempt to outrun the hurricane. On October 27, 1998, the thirty-one crew members who remained on the ship perished when the ship disappeared and presumably sank.
Thereafter, the surviving family members of the deceased crew members filed suits in state court against Fantome, IMR, Windjammer Barefoot Cruises, Ltd., and Burke (the petitioners). The suits alleged that the petitioners negligently ordered the ship into the hurricane's path. In response to the suits, the petitioners brought the instant action for limitation of liability pursuant to the Limitation of Vessel Owner's Liability Act, 46 U.S.C. app. §§ 181-196, seeking to limit their liability under § 185. In turn, the family members filed claims in that action, seeking recovery for wrongful death and survival damages pursuant to the Jones Act, 46 U.S.C. app. § 688, and the Death on the High Seas Act, 46 U.S.C. app. §§ 761-768.
In August of 1999 the petitioners filed a motion to dismiss the family members' claims under the doctrine of forum non conveniens, arguing that Honduras was the appropriate forum. Almost a year later, following a period of discovery, the petitioners filed a new motion, advocating Panama as the appropriate forum for the action. The district court eventually granted the petitioners' second motion, dismissing the family members' claims on the grounds that United States law was inapplicable and that Panama was the appropriate forum for the action.
STANDARD OF REVIEW
We review the district court's choice of law determination de novo. Sigalas v. Lido Mar., Inc., 776 F.2d 1512, 1516 (11th Cir.1985). The district court's factual findings should be disturbed only if clearly erroneous. Szumlicz v. Norwegian Am. Line, Inc., 698 F.2d 1192, 1196 (11th Cir.1983). The district court's dismissal on grounds of forum non conveniens is reviewed for abuse of discretion. Magnin v. Teledyne Cont'l Motors, 91 F.3d 1424, 1429 (11th Cir.1996).
DISCUSSION
We have held that,
[w]hether the Jones Act applies in [a] case involves a question of choice of law, the determination of which requires *735 a two-pronged inquiry. First, the court must decide, under choice of law principles, whether the law of the United States should be applied. If United States law applies, the case should not be dismissed for forum non conveniens. If the court determines that United States law does not apply, it then examines the traditional considerations of forum non conveniens to determine whether the court should exercise its discretion and decline to assert jurisdiction over the case.
Szumlicz, 698 F.2d at 1195.
Thus, before conducting its forum non conveniens analysis, the district court was obligated to determine whether the Jones Act and the Death on the High Seas Act were applicable to the facts of this case.[1]
The Jones Act provides,
Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury ... and in case of death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury .... Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.
46 U.S.C. app. § 688(a).
In Lauritzen v. Larsen, 345 U.S. 571, 583-91[, 73 S.Ct. 921] (1953), the United States Supreme Court outlined the following seven factors for determining whether the Jones Act is applicable to a claim: (1) the place of the wrongful act; (2) the law of the ship's flag; (3) the allegiance or domicile of the injured seaman; (4) the allegiance of the shipowner; (5) the place where the shipping articles were signed; (6) the accessibility of the foreign forum; and (7) the law of the forum. The Supreme Court subsequently stressed that the Lauritzen factors were neither exhaustive nor meant to be applied mechanically to the facts of each case. See Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 308-09[, 90 S.Ct. 1731] (1970). The Court then noted the importance of an eighth factor, the "shipowner's base of operations." Id. at 309[, 90 S.Ct. 1731].[2]
The district court conducted its choice of law analysis using the eight Lauritzen-Rhoditis factors, only four of which merited discussion and only two of which are challenged on appeal.[3] It found that, of the four relevant factors, only the shipowner's allegiance to the United States weighed in favor of applying United States law. It further determined that the three remaining factors  the allegiance or domicile of the injured seamen, the inaccessibility of the *736 foreign forum, and the base of operations  weighed in favor of a finding that United States law was not applicable. The court therefore concluded that United States law was inapplicable to the dispute and proceeded with its forum non conveniens analysis.
With respect to the choice of law analysis, the family members do not challenge the district court's factual findings with respect to the allegiance of the shipowner or the inaccessibility of the foreign forum. Thus, we need address only the domicile of the injured seamen and the ship's and shipowners' base of operations.
The family members challenge the district court's finding that the allegiance or domicile of the injured seamen weighed in favor of the petitioners. The thirty-one injured crew members were from eleven different countries, but none were from the United States. The family members argue that the fact that the crew members were from eleven different countries creates a powerful argument for applying United States law. We do not agree. As none of the deceased crew members were American, there is no reason to conclude that United States law should be applied to the exclusion of the law of any other foreign country. We therefore agree with the district court that this factor does not support a conclusion that United States law is applicable.
[1] The family members also challenge the district court's determination that the FANTOME's base of operations was outside of the United States. They argue that, with the exception of the captain's ability to make decisions on the vessel, the Miami Beach headquarters controlled every aspect of the FANTOME's operations, and that this fact should have led the court to conclude that Miami Beach was the ship's base of operations.
[2] We agree that the district court's finding with respect to the ship's base of operations was clearly erroneous and believe that the district court placed too much emphasis on the fact that the FANTOME never entered a United States port and too little emphasis on the extensive contacts between the United States and the shipowners. In Rhoditis, the Supreme Court stressed the need to look beyond corporate formalities to examine both the ship's and the shipowner's operational contacts with the United States. Id. at 310[, 90 S.Ct. 1731]. The Court specifically recognized that if "the liberal purposes of the Jones Act are to be effectuated, the facade of the operation must be considered as minor, compared with the real nature of the operation and a cold objective look at the actual operational contacts that this ship and this owner have with the United States." Id.[4] Though the district court acknowledged that the shipowners had strong ties to the United States, it found that the operational contacts between the ship itself and the United States were insignificant.[5] In contrast, *737 we find that the shipowners' substantial contacts with the United States are sufficient to establish that the FANTOME's base of operations was Miami Beach.
It is undisputed that the FANTOME never entered a United States port and that all of its day-to-day repairs and maintenance took place at the various locations in the Caribbean at which it was docked. These activities suggest that the ship's daily operations took place in the Caribbean, but do not prevent a finding that the corporate base of operations was the Miami Beach headquarters. See Neely v. Club Med Mgmt. Servs., Inc., 63 F.3d 166, 194 (3d Cir. 1995)(en banc)("Moreover, because we are inquiring into the substantiality of contacts with the United States, we consider both the base of daily operations of the vessel ... and the corporate bases of the defendants."). It is clear that the corporate operations of the entire Windjammer Fleet were based in Miami Beach. It was there that the advertising, reservations and sales of Windjammer cruises took place, and that the supply company, purchasing agent, and ticketing agent for all of the crew and passengers were located. All of the FANTOME's disbursements, payments, payroll, and other expenses were drawn from Windjammer bank accounts, located in Miami Beach. It was in the Miami Beach headquarters that all decisions regarding the ship's itineraries were made and where coordination of the ship's repairs, inspections, and supervision took place. Finally, all of the communications equipment used to interface with the ship was located in Miami Beach. Nowhere in the record is it suggested that these activities were carried out in any foreign country. Moreover, it does not appear that Windjammer had any agents located in foreign countries. Every decision that was not made on the ship appears to have been made at the Miami Beach headquarters.
The fact that the FANTOME never entered a United States port, while significant, is not determinative of whether the ship had a United States base of operations.[6] If the petitioners are to be *738 believed, the ship had no permanent base of daily operations. Such being the case, the district court should have given more weight to the substantial corporate contacts between the shipowners and the United States. We believe that these contacts make it clear that the true base of operations for both the FANTOME and the entire Windjammer Fleet was Miami Beach, where almost all of the decision-making power and responsibility for the operation of the fleet was located.
[3-5] Having concluded that the base of operations was Miami Beach, we return to the question of whether United States law was applicable. In making this determination, "our task is not to weigh or balance present against absent contacts, but merely to determine whether the contacts which are present are substantial." Moncada v, Lemuria Shipping Corp., 491 F.2d 470, 472 (2d Cir.1974). Of the four relevant factors, two  the allegiance and domicile of the shipowners and the presence of a United States base of operations  establish contacts sufficient to determine that United States law is applicable. If the Supreme Court's intention was to prevent an alien owner with extensive American contacts from avoiding the obligations of the Jones Act, it certainly would violate the spirit of Rhoditis if we allowed American owners to avoid the same obligations. 398 U.S. at 310[, 90 S.Ct. 1731] ("We see no reason whatsoever to give the Jones Act a strained construction so that this alien owner, engaged in an extensive business operation in this country, may have an advantage over citizens engaged in the same business by allowing him to escape the obligations and responsibility of a Jones Act employer") (internal quotation marks omitted). Our responsibility in conducting a Lauritzen-Rhoditis choice of law analysis is to "examin[e] the substance of the connections for the purpose of determining the reasonableness of applying American law under the circumstances." Neely, 63 F.3d at 194. As the petitioners have extensive business operations in Miami Beach, we believe that it is more than reasonable to apply United States law even though the petitioners' ships never entered a United States port.
Having resolved the choice of law question, we find it unnecessary to address the second prong of the Jones Act inquiry. Because United States law is applicable, we need not review the district court's forum non conveniens analysis. See Szumlicz, 698 F.2d at 1195 (noting that the action should not have been dismissed for forum non conveniens because United States law was applicable).
CONCLUSION
Accordingly, the district court's order granting dismissal of this action is REVERSED, and this case is REMANDED to the district court for further proceedings consistent with this opinion.
NOTES
[1] As we find that the Jones Act is applicable, it is unnecessary to address the Death on the High Seas Act.
[2] Although the Rhoditis Court referred to the "shipowner's" base of operations, it later noted that the operational contacts of both the ship and its owner were to be considered in the choice of law analysis. Id. at 310, 90 S.Ct. 1731. Thus, throughout this opinion, we refer at various times to both the ship's and shipowner's base of operations.
[3] The court found that the following four factors weighed in favor of neither party, and thus were irrelevant to the analysis: (1) the law of the ship's flag; (2) the place of the wrongful act; (3) the place where the shipping articles were signed; and (4) the law of the foreign forum. We do not believe that the court's factual findings with respect to these factors were clearly erroneous. We therefore leave them undisturbed.
[4] The Court made a similar statement in Lauritzen, noting that courts often have ignored "foreign registration to enforce against American shipowners the obligations which our law places upon them." 345 U.S. at 587, 73 S.Ct. 921.
[5] The petitioners and the district court likened this case to Villar v. Crowley Maritime Corp., 782 F.2d 1478 (9th Cir.1986). In that case, the Ninth Circuit determined that a United States base of operations alone was not a sufficient basis for applying the Jones Act where the vessel was located in Saudi Arabian waters and "was not `earning income from cargo originating or terminating' in the United States." Id. at 1482 (quoting Rhoditis, 398 U.S. at 310, 90 S.Ct. 1731). The court noted that "it does not follow that the application of American law is required ... [where] the only contact with the United States remains ultimate American ownership or control of the business ventures." Id. at 1481 (alterations in original)(internal quotations marks omitted). It then concluded that other factors in the Lauritzen-Rhoditis analysis "point powerfully to the application of foreign law." Id.

In this case, however, there are no factors that "point powerfully to the application of foreign law." Id. Moreover, although Villar and Rhoditis indicate that whether a vessel sails in American waters or enters American ports is significant in the "base of operations" analysis, Id. at 1482, we do not believe it to be determinative. Where, as here, the owner of a vessel has substantial contacts with the United States, the fact that the vessel never enters the navigable waters of the United States does not militate against a finding that either the ship or the shipowner has a base of operations in the United States.
[6] We are not aware of any case finding substantial contacts between a vessel and the United States that has been decided based solely upon whether the vessel enters the ports or navigable waters of the United States. See Sosa v. M/V Lago Izabal, 736 F.2d 1028, 1032 (5th Cir.1984)(finding a United States base of operations where a vessel regularly loaded cargo in Houston, all of the management operations were conducted out of the Houston office, the vessel's shipping agent was in Houston, and over ninety percent of the shipowner's stockholders were American citizens); Szumlicz, 698 F.2d at 1196 (finding a United States base of operations for a Norwegian shipowner where the operation was financed substantially by American concerns, the shipowner maintained offices in Florida and New York, and the ship called in Florida port every two weeks); Moncada v. Lemuria Shipping Corp., 491 F.2d 470, 473 (2d Cir.1974)(finding substantial American contacts where a shipowner was a corporation wholly owned by Americans, the management and chartering of the vessel were conducted from the United States, all of the officers of the shipowner corporation were American, and forty percent of the vessel's voyages began or ended in the United States).