COWEN, Circuit Judge,
concurring and
dissenting.
I concur with the result reached in part II of the majority opinion. However, because the majority has muddied the waters by creating a new choice-of-law test that rejects binding Supreme Court precedent,[1] and has consequently improperly balanced the Lau-ritzen[2] factors, I am compelled to dissent from part III of the opinion. Because of my conclusion that United States[3] law does not apply to this controversy, I find it unnecessary to discuss the issue raised in part IV of the majority opinion. Nonetheless, were I required to reach the issue of the molding of the verdict, I would concur with the majority.
Part I of my dissent will focus on how the majority has misapplied Lauritzen and, in so doing, has shifted the burden to the defendants to prove that United States law does not apply. Part II of my dissent will discuss and apply the proper balancing approach and burden of proof as set forth in Lauritzen and show that the majority’s conclusion that United States law applies can be reached *207 only by redrafting the Lauritzen balancing test.
I.
The majority begins part II by correctly noting that a maritime choice-of-law controversy must be resolved by examining the eight factor test as set forth, reiterated, and expanded in the Lauritzen triad. Maj. op. at 173-74. It then recognizes that a plaintiff suing under United States law must “establish the applicability of the law under which the case was brought,” Maj. op. at 181, that is, it is the plaintiffs burden to prove that United States law should govern this maritime controversy. The majority, according to the mandate of the Lauritzen triad, should next have turned to the eight factors and conducted a balancing inquiry to determine whether the plaintiff has proven that United States law applies. See discussion infra part II.
However, before arriving at the balancing inquiry, the majority, apparently not content with the law in its current state, decides to treat Lauritzen merely as persuasive authority and proceeds to create a new test to govern maritime choice-of-law disputes. Instead of applying the eight factor test as set forth in Lauritzen, the majority veers off course and employs a two-step analysis. In the first step, only four of the eight factors from Lauritzen are analyzed: domicile of the injured seaman, place of the injury, allegiance/domicile of the defendant, and law of the flag. A fifth factor, a contractual choice-of-law clause, which is a factor not present in Lauritzen, is also considered under the majority-created test. After analyzing half of the Lauritzen factors in step one, if any of the factors are present, the majority then proceeds to step two of the analysis. In step two, the court must now consider all eight factors in order to determine whether the application of United States law would be reasonable. Maj. op. at 182-83.
I have searched the Lauritzen triad in vain and have been unable to locate in any of the opinions where the Supreme Court states or even implies that a two-step inquiry, such as the one utilized by the majority, should be undertaken. I must conclude, therefore, that Lauritzen does not contain any such test and the majority is acting beyond the scope of Lauritzen. The majority acknowledges, as it must, the lack of authority for its proposed two-step reasonableness inquiry. In an attempt to gamer support for its position, the majority relies on the Restatement (Third) of Foreign Relations Law. Maj. op. at 184 n. 16 (stating that “relying on current versions of the Restatement to interpret both general maritime law and the Jones Act — even though it was adopted long after the Supreme Court announced the Lauritzen factors — is permissible”). I do not agree that such reliance is appropriate.[4]
First, although an earlier version of the Restatement of Foreign Relations Law was available to the Supreme Court when it wrote Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959) and Hellenic Lines Limited v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), the Supreme Court did not rely on this source.[5] Second, a close reading of the Introductory Note to the Re *208 statement sections relied upon by the majority indicates that sections 402 and 403 were not meant to apply in a tort case such as this. The Introductory Note to the subchapter in which these provisions appear states:
In a number of contexts the question of jurisdiction to prescribe resembles questions traditionally explored under the heading of conflict of laws or private international law. This chapter, however, concentrates on so-called public law — tax, antitrust, securities regulation, labor law, and similar legislation. The issues addressed may arise in private litigation, but the rules stated in this chapter do not necessarily apply to controversies unrelated to public law issues.
1 Restatement (Third) of the Foreign Relations Law of the United States 237 (1987) (emphasis added). Third, such wholesale judicial activism should be discouraged, especially where the Supreme Court has already adequately detailed the proper approach to resolve such controversies.[6]
Given that the Supreme Court has already created a suitable test for governing maritime choice-of-law disputes, I question why the majority deems it necessary to create a new test. Apparently, the majority adopts this approach to effectuate a shift in the burden of proof: rather than require the plaintiff to prove that the factors weigh in favor of the application of United States law, the majority forces the defendants to show that United States law does not apply. Maj. op. at 188 (“[0]nee the plaintiff has established the existence of [one of the five factors from part one of the two step test] ..., it is incumbent upon defendants to prove the existence of foreign contacts.”). Only by shifting the burden of proof can the majority reach its desired result — the application of United States law.
The majority itself notes the inherent weakness of this burden shift. The majority concedes that the plaintiff must prove that United States law applies. Maj. op. at 180-81, 187. Moreover, the majority admits that its holding is not supported by established precedent. Maj. op. at 187 (“While there is a dearth of precedent concerning the scope of the plaintiff’s burdens when the defendant invokes the Lauritzen triad, logic dictates that plaintiff need adduce evidence concerning only those factors that he or she believes support the reasonableness of applying American law.”) (emphasis added). I disagree. Both precedent and logic dictate that we not deviate from Lauritzen. By placing the burden on the defendants to prove that United States law should not apply, the majority has broadened the scope and applicability of the Jones Act despite a concerted effort on part of the Supreme Court in Lau-ritzen to restrict its scope. See generally *209 Maj. op. at 180-81 (explaining that the Supreme Court created the balancing test in Lauritzen in order to limit the scope of the Jones Act).
Under the majority’s holding, if the plaintiff proves she is a United States citizen (or she has United States dependents or she was injured in United States territory or the defendants were domiciled in America or the vessel flew a United States flag or a contractual choice-of-law clause specifying United States law existed) and the defendants fail to prove any of the eight factors, then United States law will always apply. The majority has adopted a broad reading of the Jones Act, a reading that the Supreme Court frowned upon in Lauritzen. See Lauritzen, 345 U.S. at 576-78, 73 S.Ct. at 925-26. The rule of law handed down today has the following practical effect: so long as the injured plaintiff is a United States citizen, he or she will almost always have the benefit of suing under the Jones Act, Lauritzen notwithstanding.
In order for United States law to apply, Lauritzen requires that the factors weigh in favor of application of United States law. Thus, under the Lauritzen test, the plaintiff must prove that a simple majority or preponderance of the factors weighs in favor of United States law.[7] In shifting the burden of proof to the defendants, the majority goes a long way towards ensuring that “all seamen” who are injured will be able to proceed under United States law.
To further ensure this result, the majority also substantially increases the burden on the defendants. Not yet content with the stacked deck employed against the defendant, the majority, in addition to requiring the defendant to bear the new burden of showing that the balancing weighs in favor of foreign law, also requires the defendant to prove that the application of United States law is “unreasonable.” Lauritzen has no such reasonableness requirement. As a result of the majority’s analysis, even if the defendants were to prove that more of the factors weigh in favor of the application of foreign law, the court would still have to apply United States law unless the defendants also show that the application of United States law is unreasonable. See Maj. op. at 190 (“[Ujnless virtually all of the Laurit-zen factors point away from the United States, application of American law will be reasonable_”). Clearly, it will always be more difficult if not impossible to prove that the application of United States law is unreasonable as opposed to simply proving that the balancing weighs against the application of United States law. Stated differently, even if the balancing weighs against the application of United States law, it is not necessarily the case that the application of United States law would be unreasonable. Whereas the burden shift made it extremely likely that United States law would apply, the heightening of the burden makes the application of United States law almost inevitable. Indeed, rare will be the case under the majority’s analysis where United States law does not apply.[8]
The majority has adopted a reasonableness standard which has shifted the burden of proving that United States law applies from the plaintiff to the defendant and has come dangerously close to creating a per se rule that the Jones Act applies to all United States seamen. In contrast, Lauritzen does not require the defendant to prove that foreign law applies nor does it require the de *210 fendant to prove that the application of United States law would be unreasonable; Lau-ritzen requires the plaintiff to prove that United States law applies.
II.
Inasmuch as the majority rejects Laurit-zen, the balancing portion of the majority opinion is necessarily wrong because it improperly shifts and heightens the burden of proof, thus making it more likely for the factors to point towards the application of United States law. The majority compounds this error by attributing too much significance to some of the factors and additionally downplaying the importance of some of the historically recognized significant factors.
As mentioned previously, the eight factors to be considered in Jones Act and maritime choice-of-law disputes are (1) law of the flag; (2) shipowner’s base of operations; (3) allegiance of the defendant shipowner; (4) inaccessibility of a foreign forum; (5) place of the wrongful act; (6) place of the employment contract; (7) allegiance or domicile of the injured party; and (8) law of the forum. Lauritzen, 345 U.S. at 583-92, 73 S.Ct. at 928-33; Rhoditis, 898 U.S. at 308-09, 90 S.Ct. at 1733-34. I now turn to a proper analysis of those factors.

1. Law of the Flag

The nationality of the vessel’s flag is the single most important factor in the Jones Act choice-of-law analysis. The Supreme Court stated in Lauritzen that “the most venerable and universal rule of maritime law relevant to our problem is that which gives cardinal importance to the law of the flag.” 345 U.S. at 584, 73 S.Ct. at 929. With respect to this factor, the district court found that “the diving vessel flies the flag of St. Lucia.” Neely v. Club Med Sales, Inc., No. 91-7416, 1992 WL 398378, at *3 (E.D.Pa. Dec. 31, 1992). Neely maintains that there was no evidence presented before or during trial to establish that the vessel Long John actually flies the flag of St. Lucia. However, the defendants point out that the finding of the district court was based on the pre-trial declaration of vessel owner, Joseph LeMaire (“LeMaire”), which was submitted in support of his successful motion to dismiss the third-party complaint against him. LeMaire stated that the Long John is registered in St. Lucia, and his sworn declaration has not been contradicted.
Defendants argue that registration of a vessel in a particular country is equivalent to “flagging” the vessel. Although no authority explicitly states that registration and flagging a vessel are one and the same, there is authority which indicates that “[a] ship navigating the seas may sail only under the flag of the nation in which it is registered.... ” 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 2-21, at 46 n. 1 (2d ed. 1994) (citation omitted). Thus, since the Long John was registered in St. Lucia, it was required to fly a St. Lucian flag.
Because the plaintiff bears the burden of proving the flag as well as law of the flag, cf. Maj. op. at 193, it would even be insufficient if Neely proved that the Long John was not flying a St. Lucian flag. The plaintiff still has the additional hurdle of proving that the vessel was flying a United States flag in order for this factor to weigh in favor applying United States law. Since the only evidence pertaining to law of the flag adduced in the district court indicates that the vessel was a St. Lucian flagged vessel, I conclude that this factor weighs heavily against applying United States law to this controversy.
The majority maintains that the law of the flag is less important in non-traditional maritime contexts and concludes that the vessel Long John was involved in a non-traditional maritime activity. Maj. op. at 192-93. In support of this proposition, it relies on a number of cases from other courts of appeals which hold that law of the flag should not be given controlling weight when dealing with a vessel engaged in nontraditional maritime activity. See Zipfel v. Halliburton Co., 832 F.2d 1477, 1483 (9th Cir.1987) (law of the flag accorded less weight when vessel was a floating oil drilling rig which “was unable to move under its own power, had to be towed by other vessels when moved, and had remained for long periods of time prior to the accident *211 at only a few drilling locations”);[9] Cuevas v. Reading & Bates Corp., 770 F.2d 1371, 1373, 1379 (5th Cir.1985) (same, involving a semi-stationary, jack-up drilling ship); Koke v. Phillips Petroleum Co., 730 F.2d 211, 213, 219 (5th Cir.1984) (same, concerning a semi-submersible platform that: rested on columns attached to floatation chambers; performed its work while anchored; and although it could move under its own power, was towed to its current location and remained there for a year before the incident). The majority has unhesitatingly adopted the reasoning set forth in the aforementioned cases while failing to ask whether the vessel Long John (“a sixteen metric ton vessel capable of plying the high seas,” Maj. op. at 192), was engaged in activity more akin to a floating/semi-submersible/semi-stationary oil drilling rig or more akin to an ocean-going vessel. It borders on the incredible to suggest that this case which involves an oceangoing marine craft should be governed by eases which involve semi-stationary oil drilling rigs.
In support of its assertion that the Long John was engaged in non-traditional maritime activity, the majority also notes that the-Long John maneuvered from “beach to reef,” and not from “sea to sea.” Maj. op. at 191. I am intrigued by the new “sea to sea”/ “beach to reef’ dichotomy created by the majority, because it is the clearest indication of how the majority has misapplied the Lau-ritzen test in arriving at its result that American law should be applied to this controversy. The majority must acknowledge that the cases upon which it relies to downplay the importance of the law of the flag factor do not involve vessels that travel from “beach to reef.” Rather, those cases involve vessels that are engaged in activity so far removed from any shipping context that it defies reality to even refer to them as vessels or to consider their activity maritime in nature. Thus, to complete the majority’s analogy, we must not only consider “sea to sea” and “beach to reef,” but we must also consider “oil drilling platforms.”[10] The majority implicitly holds that the law of the flag factor should be accorded little or no weight because the vessel Long John engaged in activity more analogous to that of an oil drilling platform. I cannot agree.
Further, I am puzzled by the majority’s conclusion that the vessel Long John was engaged in non-traditional maritime activity in light of the majority’s earlier assertions to the contrary. In assessing whether jurisdiction existed in the district court to entertain this suit, the majority notes that the accident involving Neely and the Long John “is the kind of incident that has a potentially disruptive impact on maritime commerce.” Maj. op. at 179 quoting Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., — U.S. —, —, 115 S.Ct. 1043, 1051, 130 L.Ed.2d 1024 (1996). Next, the majority concludes that although the Long John made voyages of relatively short distances, nonetheless, “the general character of the activity giving rise to the [accident] shows a substantial relationship to traditional maritime activity.” Maj. op. at 179 (quoting Grubart, — U.S. at —, 115 S.Ct. at 1051). See also Grubart, — U.S. at -, 115 S.Ct. at 1052 (“The substantial relationship test is satisfied when at least one alleged tortfeasor was engaging in activity substantially related to traditional maritime activity.”). Because the majority adopts inconsistent positions when discussing the traditional or nontraditional character of the activity in which the Long John was engaged, I find no reason to downplay the importance of law of the flag in this case.
*212 The majority concedes that plaintiff has failed to prove that the Long John flies a United States flag. Maj. op. at 50. Nonetheless, the majority concludes that this factor does not subtract from the plaintiffs argument because the defendants failed to prove what flag the Long John flew. As stated above, I believe there is ample, credible, uncontradicted evidence to suggest that the Long John was a St. Lucian flagged vessel. Moreover, the district court made a specific factual finding that the Long John flies the flag of St. Lucia, see Neely, 1992 WL 398378, at *3, and this finding cannot be disturbed unless it is clearly erroneous.[11] In addition, because the plaintiff must prove that United States law applies, see discussion supra part I, the majority is incorrect in concluding that this factor is insignificant and should be accorded little weight.

2. Shipowner’s Base of Operations

The district court, looking at the base of operations of the shipowner, LeMaire, concluded that this factor was unclear, and thus favored neither the application of United States nor St. Lucian law. Neely, 1992 WL 398378, at *3. Plaintiff argues, and the record supports the conclusion, that Holiday Village chartered this vessel from the actual shipowner in a manner consistent with a bareboat or demise charter. Appellant/Cross-Appellee’s Reply/Answering Brief at 40-47. A “bareboat” charter or “demise” charter exists whenever the:
vessel is chartered or “leased” to another who takes possession, custody and control of the vessel. The master is hired and paid by the charterer and becomes the agent and representative of the charterer. The operating expenses of the vessel, such as wages, fuel, subsistence, wharfage charges, etc., are paid by the charterer. The owner surrenders entire control and possession of the vessel and subsequent control over its navigation to the bareboat charterer, who becomes the owner pro hac vice.
2 Martin J. Norris, The Law of Seamen § 30:14, at 372 (4th ed. 1985). Thus, by contracting a demise charter with the actual shipowner, Holiday Village became the owner pro hac vice of the Long John.[12] Since we look to Holiday Village (a St. Lucian corporation), rather than LeMaire of Miami, as the owner of the vessel, I would hold that this factor weighs in favor of applying St. Lucian law and against applying United States law.
Relying on Fogleman v. ARAMCO, 920 F.2d 278 (5th Cir.1991), the majority contends that this is not a traditional shipping case and therefore, we should not look to the base of operations of the defendant shipowner, but rather to that of the defendant employer. Maj. op. at 194 (“[W]e must consider the ... bases of operations of both Holiday Village and Club Med Management.”) (emphasis in original). In that case, involving personal injuries sustained on a fixed oil platform, the Court of Appeals for the Fifth Circuit held that the significance of each Lauritzen factor may vary in a non-traditional shipping case. Fogleman, 920 F.2d at 282. First, the majority analogizes this case to one involving an offshore oil rig or work platform. To the extent that the majority’s argument relies on the notion that the Long John was engaged in activity more analogous to that of an oil rig rather than an oceangoing vessel, it must again fail. Second, in *213 Fogleman, the Court of Appeals for the Fifth Circuit held that:
Particularly when non-traditional maritime activities with relatively permanently based vessels are involved, “it is the base from which the rig is operated on a day-today basis rather than the base of operations of the corporate or ultimate owner of the rig which is important for choice of law purposes.” We look to the location of the day-to-day operations even when the employer is a wholly-owned subsidiary of an American corporation, so long as the foreign subsidiary was not formed specifically to evade obligations of the parent corporation under American law.
Fogleman, 920 F.2d at 284 (citations and footnotes omitted).[13] Thus, even if we were to follow the reasoning of Fogleman, it mandates that we should look to St. Lucia (the base from which the vessel is operated on a day-to-day basis), rather than to New York (the base of operations of Club Med Management).
The majority concedes that the Long John was operated exclusively in St. Lucia and that Holiday Village is a St. Lucian corporation. Predictably, however, the majority concludes that this factor only weakly favors the application of St. Lucian law. Instead it argues that we should look to the activity of Club Med Management and Club Med Sales. However, any activity conducted by Club Med Sales is irrelevant to this dispute because it was never determined to be an employer of Neely.[14] Even if we were to examine the activities of Club Med Management because it was found by the jury to be Neely’s employer, we should not ignore St. Lucia’s paramount interest in having its law applied to this controversy.

3. Allegiance of the Defendant Shipowner

The district court made no definitive finding as to the allegiance of the defendant shipowner. Because the Long John was the subject of a demise charter to Holiday Village, and Holiday Village is the owner pro hac vice of the vessel, the allegiance or domicile of Holiday Village controls. Holiday Village’s allegiance is to St. Lucia. For the reasons stated above, see supra part H.2., this factor also weighs against applying United States law and points to the application of St. Lucian law.
A Inaccessibility of a Foreign Forum
Plaintiff argues that St.- Lucia is an inaccessible forum because she is in no financial position to travel to St. Lucia, hire St. Lucian counsel, and pursue an action against the defendants in the St. Lucian courts. Additionally, she claims that St. Lucia is an inconvenient forum. Similar to Neely, the plaintiff in Rodriguez v. Flota Mercante Grancolombiana, S.A., 703 F.2d 1069 (9th Cir.), cert. denied, 464 U.S. 820, 104 S.Ct. 84, 78 L.Ed.2d 94 (1983), argued that a foreign forum was not convenient to him because his physicians and medical records were in the United States and because he had retained United States counsel who would not represent him in Colombia. Id. at 1075 n. 3. The Court of Appeals for the Ninth Circuit, in rejecting the plaintiff’s argument, stated:
Convenience of the witnesses and attorney are not factors cited by the Court in Lau-ritzen and Rhoditis as determinators of the Jones Act jurisdiction. Although these factors “might be a persuasive argument for exercising a discretionary jurisdiction to adjudge a controversy ... it is not persuasive as to the law by which it shall be judged.” Lauritzen, 345 U.S. at 589-90, 73 S.Ct. at 931-932. Thus, the costs and loss of time entailed in deposing the medical witnesses and sending the records and the American attorney to ... [a foreign forum] while relevant to the issue of forum non conveniens are not relevant *214 factors in determining whether [United States law should be applied].

Id.

I agree with the Court of Appeals for the Ninth Circuit that the Supreme Court in Lauritzen did not intend the “inaccessibility of a foreign forum” factor to require a forum non conveniens analysis. The Supreme Court in Lauritzen rejected the argument “that justice requires adjudication under American law to save seamen expense and loss of time in returning to a foreign forum.” 345 U.S. at 589, 73 S.Ct. at 932. Lauritzen indicates that inaccessibility of the forum and forum non conveniens are two separate and distinct matters. Therefore, discounting any claim of inconvenience by Neely in bringing this suit in a foreign forum, it is not clear why a forum in St. Lucia would be inappropriate. Neely has offered no credible evidence to indicate that St. Lucia will not entertain such a suit or that there are other barriers to her being heard in that jurisdiction.[15]
The majority treats this factor as neutral, “especially ... because the defendants have presented the court with no information about what remedies St. Lucian law might ... offer the plaintiff.” Maj. op. at 190. When one recognizes the fallacy of assigning the burden to the defendant, the majority’s argument does not hold water. Because plaintiff bears the burden of proof, this factor weighs against applying United States law to this dispute.

5. Place of the Wrongful Act

Plaintiff concedes that the accident took place within two-hundred meters of the St. Lucian shoreline. This factor, therefore, favors application of St. Lucian law rather than United States law. However, Neely contends that this factor should be accorded little weight because of the fortuity of the sailing vessel being in the particular place where the accident occurred. Indeed, in Lauritzen, the Supreme Court stated that, “[t]he test of location of the wrongful act or omission, however sufficient for torts ashore, is of limited application to shipboard torts, because of the varieties of legal authority over waters she may navigate.” Lauritzen, 345 U.S. at 583, 73 S.Ct. at 929.
Normally, the place of accident might well be fortuitous. Here, however, the vessel was chartered by Holiday Village to be used specifically by diving parties in and around St. Lucia. St. Lucia has set its territorial waters at a breath of 12 nautical miles. 6B Benedict on Admiralty Doc. 10-3A, at 10-62, 10-62.2 (Frank L. Wiswall, Jr., ed., 6th ed. 1994). Rarely, if ever, during its demise charter did the Long John leave the territorial waters of St. Lucia. It is true that the vessel had the capability of traveling vast distances, and even worldwide. However, when analyzing whether the location of the accident in St. Lucian waters was fortuitous, it becomes clear that if the vessel never left the territorial waters, then an accident in St. Lucian waters was not simply by chance. In fact, anyone sailing aboard the Long John, whether as crew or otherwise, would reasonably conclude (as occurred in this ease), that any accident would occur in the territorial waters of St. Lucia. This factor weighs strongly in favor of applying St. Lucian law to this dispute.
The majority agrees with this analysis, but concludes that “this factor does not strongly suggest that application of American law would not be reasonable.” Maj. op. at 192. Notwithstanding the fact that this accident occurred in, and could only have occurred in, St. Lucian waters, the majority seeks to minimize the impact of this important factor. It asserts that even though the accident occurred in St. Lucian waters, St. Lucia’s regulatory interests are undefined, and this conclusion does not point toward application of St. Lucian law. Again, this reasoning contradicts an earlier portion of the majority opinion where it concluded the accident involving Neely and the Long John “is the kind of incident that has a potentially disruptive impact on maritime commerce.” Maj. op. at *215 179 quoting Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., — U.S. —, —, 115 S.Ct. 1043, 1051, 130 L.Ed.2d 1024 (1995). Clearly, in a situation where an accident occurs within two-hundred meters of the St. Lucian coastline, we need not be familiar with the complexities of St. Lucian law in order to conclude that St. Lucia has an interest in preventing or investigating any accident which may have a detrimental effect on maritime commerce in its territorial waters. Because the place of wrongful act was not fortuitous, and St. Lucia has a cognizable interest in accidents which occur off its shores, this factor weighs strongly against applying United States law to this controversy.

6. Place of Employment Contract

The district court made a factual finding that the oral employment contract entered into between Club Med and Neely, by virtue of a phone call from Club Med’s offices in New York to Neely’s residence in Pennsylvania, was situated in Pennsylvania. Neely, 1992 WL 398378, at *4. Defendants do not challenge the district court’s finding as clearly erroneous, but instead argue that the factor should be given diminished weight since the employment services were to be performed outside the United States. The Supreme Court in Lauritzen has explained that, “[t]he place of contracting in this instance, as is usual to such contracts, was fortuitous.... We do not think the place of contract is a substantial influence in the choice between competing laws to govern a maritime tort.” Lauritzen, 345 U.S. at 588-89, 73 S.Ct. at 931-32.
The majority maintains, notwithstanding the language in Lauritzen, the place of contract takes on heightened significance in the context of non-traditional maritime employment. While I agree that the situation at hand is not the same type of employment arrangement contemplated by the Court in Lauritzen, I do so for different reasons.
Because I do not consider Neely’s employment situation to be non-traditional in nature, I do not believe that this factor should be accorded additional significance, but rather, it should be treated with the same weight as the other factors. I acknowledge that there is less fortuity in the place of contracting here simply because hiring Neely was not an unforeseen contingency like that alluded to in Lauritzen. However, the vessel on which Neely worked was akin to an oceangoing vessel, thus putting her in the realm of traditional maritime activity. See discussion supra part II.1. Additionally, Neely was paid in a similar manner to the traditional ocean-travelling maritime worker — room and board provided by the employer.

7. Allegiance or Domicile of the Injured Party

Neely is a United States citizen who lived permanently in Pennsylvania until she was hired by Club Med. She returned immediately to the United States for medical attention and rehabilitation after the accident. Thus, this factor clearly weighs in favor of applying United States law. However, because I do not believe that this case involves a non-traditional shipping context, I believe that this factor should be accorded normal significance. To the extent that the majority relies on language in the Jones Act and its amendments (which refers to “American seaman”) to support its proposition that this factor takes on heightened significance here, the majority is simply engaging in double counting of the factors. The Supreme Court in Lauritzen already contemplated situations where seamen are of differing national origins. If the plaintiff is a United States seaman, this factor weighs towards applying United States law and if the plaintiff is not a United States citizen domiciliary, this factor points towards applying some other law. It is unclear why the majority thinks that this factor should carry more weight in addition to that already provided for by the Supreme Court. The majority, despite its assertions to the contrary, comes exceedingly close to creating a per se lex Americana rule (United States law always applies to injured United States seaman).[16]

*216
8. Law of the Forum

The district court found that the law of the forum factor did not weigh in favor of either the United States or St. Lucia, Neely, 1992 WL 398378, at *4, and neither party contends on appeal to the contrary. In discussing the relevance of the law of the forum factor in a maritime choice-of-law dispute, the Supreme Court noted that “[b]ecause a law of the forum is applied to plaintiffs who voluntarily submit themselves to it is no argument for imposing the law of the forum upon those who do not.” Lauritzen, 345 U.S. at 591-92, 73 S.Ct. at 933. A close reading of Lauritzen indicates that the Supreme Court did not think this a relevant factor to consider when a defendant is haled into court against his will and involuntarily subjected to the law of that forum. The majority, in analyzing this factor, cites language from Lauritzen that states the forum available should not dictate the substantive law to be applied. Maj. op. at 190 (quoting Lauritzen, 345 U.S. at 591, 73 S.Ct. at 932). However, the majority then concludes “albeit weakly, the law of the forum [factor] supports application of American law.” Maj. op. at 190. I am unable to comprehend how the language cited by the majority even “weakly” supports such a conclusion. The law of the forum is a neutral factor and does not weigh towards the application of either United States or St. Lucian law.
III. Conclusion
Neely has failed to prove that substantial links with the United States exist: (1) the law of the flag, the most important factor, points to the application of St. Lucian law; (2) the shipowner’s base of operations clearly indicates that St. Lucia is the appropriate forum; (3) the allegiance of the defendant shipowner points to St. Lucia; (4) there is no indication that a St. Lucian court is inaccessible to the plaintiff; and (5) the wrongful act occurred in St. Lucian territorial waters. The only factors that weigh in favor of applying United States law are: (1) the plaintiff is a citizen of the United States; and (2) the place of the employment contract was the United States. The law of the forum is a neutral factor. Based on the totality of these eight factors, I conclude that United States law should not be applied to this controversy.
Because plaintiff has neither pled nor proven St. Lucian law, this suit must fail on the merits. However, as alluded to by the majority, see Maj. op. at 181 n. 11, I do not rule out the possibility of the district court upon remand granting plaintiff leave to plead and prove foreign law in light of my conclusion that United States law does not apply. Such leave to re-plead, of course, should be without prejudice to the right of the defendant to assert forum non conveniens.
Earlier the majority lamented that the eight-factor balancing test “is sufficiently obscure or variable to justify any judicial result.” Maj. op. at 182 (quoting Munusamy, 579 F.Supp. at 153). The majority has certainly proven this to be true. Yet, the majority reaches its result today not only by misapplying the Lauritzen factors, but also by adding a new and confused choice-of-law analysis. Because the majority has deviated from Lauritzen, I must dissent.
MANSMANN, GREENBERG and McKEE, JJ., join in this concurring and dissenting opinion.

. While the Court of Appeals for the Third Circuit sitting in banc can reexamine and overrule prior decisions of this Court, see Internal Operating Procedure Rule 9.1, we must nevertheless conform our holdings to Supreme Court authority-

. Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953).

.Although the Lauritzen opinion and the majority opinion are framed in terms of "American” law, I think it the better practice to refer to "United States” law because the term "American” is imprecise.

. The majority discusses at great length why it is more appropriate to rely on the Restatement (Third) of Foreign Relations Law, as opposed to the Restatement (Second) of Conflict of Laws. See. Maj. op. at 183-84 n. 15. The majority misapprehends my position. In arguing that it is improper to rely on the Restatement of Foreign Relations Law, I do not mean to suggest that the majority should instead rely on the Restatement of Conflicts. Rather, I believe that neither source should be utilized and instead we should look to Lauritzen, the only authoritative and binding source.
Additionally, the majority cites a law review article which suggests that combining the Laurit-zen and Restatement of Foreign Relations Law factors would be appropriate to solve choice-of-law controversies in outer space. See Maj. op. at 184 n. 16. Because the dispute before us lacks any extraterrestrial contacts, I am not moved by the force of this argument.

. The Restatement (Second) of Foreign Relations Law, although not published until 1965, had tentative drafts available as early as 1957. Thus, the Supreme Court could have utilized this source in Romero or Rhoditis had it so desired. The fact that any mention of the Restatement in these cases is noticeably absent is a clear indication that the Supreme Court did not intend future courts to rely on it in the context of maritime choice-of-law disputes.

. To prop up its argument that we should rely on the Restatement (Third) of Foreign Relations Law, the majority cites to: (1) a change in the Jones Act statute of limitations; (2) a 1982 amendment to the Jones Act; and (3) a passage from the Restatement which suggests that choice-of-law rules should be interpreted flexibly. Maj. op. at 184 n. 16. I am underwhelmed. As a preliminary matter, I fail to comprehend how a change in the applicable statute of limitations bears on the question of whether the Restatement is relevant. Moreover, while it may be proper to re-examine the Jones Act in light of Congressional amendments, nothing in these amendments suggests that we should look to the Restatement of Foreign Relations Law. Indeed, the Restatement (Third) of Foreign Relations Law did not even exist at the time these amendments were passed.
The 1982 amendment restricted the scope of the Jones Act and made it more difficult for nonresident aliens to recover. This amendment may hint at Congressional dissatisfaction with the wide breadth of the Jones Act, despite the Supreme Court's attempt in Lauritzen to narrow its scope. However, it does not follow that because Congress wanted to limit the applicability of the Jones Act to primarily United States citizens and resident aliens, that it necessarily wanted to provide recovery for all United States seamen.
In addition, as stated above, the situation contemplated by the Restatement specifically involves the application of antitrust and securities laws. See Restatement (Third) of Foreign Relations Law, at 236. Because this case arises out of the tort context, I am uncomfortable relying on the Restatement (Third) of Foreign Relations Law.
Finally, plaintiff Eileen Anne Neely (“Neely” or "plaintiff”) and defendants Club Med Management Services and Holiday Village (collectively "Club Med” or “defendants" unless it is necessary to distinguish between the two) concede that the balancing test as set forth in Lauritzen governs this dispute. Although both parties disagree as to the outcome of the balancing test, neither party has suggested that the Lauritzen test is inadequate.

. The majority takes issue with my conclusion, stating that I have not remained faithful to Bartholomew v. Universe Tankships, Inc., 263 F.2d 437, 440 (2d Cir.1969), which requires "something between minimal and preponderant contacts.” See Maj. op. at 183 n. 14. While I note that Rhoditis does cite a passage from Bartholomew with approval, see Rhoditis, 398 U.S. at 309 n. 4, 90 S.Ct. at 1734 n. 4 (citing Bartholomew, 263 F.2d at 441), Rhoditis cites Bartholomew for the proposition that "[t]he significance of one or more factors must be considered in light of the national interest served by the assertion of Jones Act jurisdiction.” Rhoditis, 398 U.S. at 309, 90 S.Ct. at 1734 (footnote omitted). Hence, it is unclear from this passage that the Supreme Court intended, as the majority suggests, to reduce the plaintiffs burden to "something” less than a preponderance.

. Lauritzen does not even impose such a heightened burden on the plaintiff. The plaintiff does not have to prove that the application of foreign law would be unreasonable. Rather, the plaintiff simply must show that the factors weigh in favor of applying United States law.

. However, in this case the plaintiffs were not injured while aboard this drilling rig, but were injured (or killed) after the airplane that was transporting them to the drilling rig crashed. Thus, to the extent that the drilling rig was a vessel, it was far removed from the airplane which caused the injury.

. Because semi-stationaiy or floating work platforms do not typically move, it is difficult to accurately describe a third category of maritime activity which parallels the majority’s two categories. The first two categories ("sea to sea” and "beach to reef") depict some type of movement from one place to another which is characteristic of traditional maritime activity. In contrast, floating oil drilling rigs, see Zipfel, 832 F.2d at 1483, semi-stationary jack-up drilling ships, see Cuevas, 770 F.2d at 1373, and semi-submersible platforms, see Koke, 730 F.2d at 213, are more akin to fixed structures which present the antithesis of a traditional shipping case.

. Although in a later order the district court noted that "there was insufficient evidence ... to determine the law of the flag,” Order at 2 n.* (October 14, 1993) (App. at 4) (emphasis added), this statement does not contradict the court's earlier conclusion that the Long John flies the flag of St. Lucia. I agree with both the majority and the district court that there is insufficient evidence to determine the "law of the flag,” that is, there is insufficient evidence to determine what the law of St. Lucia provides. However, the fact that plaintiff failed to prove St. Lucian law is in no way related to the district court's determination that the Long John is a St. Lucian flagged vessel.

. Additionally, at trial, the jury concluded that the vessel Long John was owned (pro hac vice) by Holiday Village. There is nothing in the record which indicates, as the majority suggests, that Neely was a "crewmember of the vessels in the Club Med Fleet." Maj. op. at 179 n. 8 (emphasis added). Although Neely dove from both the Blue Lagoon, as well as the Long John, the record is unclear as to whether Club Med, in fact, owned the Blue Lagoon. Thus, it is hardly the case that Neely dove from multiple vessels owned or operated by Club Med.

. Plaintiff has not argued at any time that Holiday Village was incorporated solely to insulate any of the Club Med entities from liability.

. To the extent that we should even consider the activity of Club Med Sales (which I maintain is without support under prevailing caselaw), we would then also be required to examine the activity of Club Med, Inc., which is incorporated under the laws of the Cayman Islands. Certainly this would not support the application of United States law.

. The only evidence in the record is the testimony of an employee of Holiday Village who apparently was not trained in the law. When questioned by counsel whether he “[knew] anything about the St. Lucia court system,” App. at 567, the employee answered, "No, no, no.” App. at 567.

. Under a per se lex Americana rule, the eight factor balancing test is discarded in favor of a one factor test — is the plaintiff a United States seaman? If answered in the affirmative, the *216 inquiry ends and plaintiff may sue under United States law. Clearly, the Supreme Court did not contemplate such a result.
To the extent that the majority believes that the nationality of a United States seaman takes on heightened importance, see Maj. op. at 195-97 ("[Cjourts should consider claims brought by American seaman as manifesting by definition much of the necessary substantiality of connection.”), I maintain that the majority places far more emphasis on a seaman’s nationality than is required by Lauritzen.