Enrique WILLIAMS, Plaintiff,

v.

CRUISE SHIPS CATERING AND SERVICE INTERNATIONAL, N.V.; Prestige Cruises N.V.; and Costa Crociere, SPA Defendants.

No. 03–60158–CIV.

United States District Court,
S.D. Florida.

June 9, 2004.

Charles R. Lipcon, Esq., Lipcon, Marguiles & Alsina, David H. Pollack, Esq., Miami, for Plaintiffs.

Richard J. McAlpin, Esq., Jonathan H. Dunleavy, Esq., McAlpin & Brais, P.A., Miami, for Defendants.

*AMENDED* [1] *ORDER DENYING MOTION FOR RECONSIDERATION AND RECOMMENDING CERTIFICATION*

GOLD, District Judge.

THIS CAUSE is before the Court upon Defendants' Motions for Reconsideration [DE # 106, filed December 23, 2003; DE # 116, filed January 15, 2004] of the Order Denying Defendants' Motion to Dismiss on *Forum Non Conveniens* Grounds [DE # 103, filed December 9, 2003]. Plaintiff filed his Opposition to the first Motion on December 31, 2003 [DE # 107] and his Opposition to the second Motion on January 9, 2004 [DE # 114]. Defendants filed their Reply [DE # 111] on January 6, 2004. Upon review of the record, the parties' arguments, and applicable statutory and case law, the Defendants' Motion for Reconsideration is DENIED. Because other Judges in this Court have reached the different conclusions, this case is appropriate for certification pursuant to 28 U.S.C. § 1292(b).

### Background

Plaintiff, a Costa Rican citizen, brought this action against Cruise Ships Catering and Service International, N.V. ("CSCS International"), Prestige Cruises, N.V. ("Prestige"), and Costa Crociere, S.p.A. ("Costa Crociere" or "Costa") for injuries he suffered on two separate occasions in October and November 2000 while he worked aboard the M/S Costa Atlantica

1. This Amended Order makes the following change: in the Order Denying Motion for Reconsideration and Recommending Certification (DE # 127, filed March 31, 2004), I stated that Carnival is "a Florida corporation, with its principal place of business in Miami ...." Order Denying Motion for Reconsideration at 4, citing Order Denying Defendant's Motion to Dismiss on *Forum Non Conveniens* Grounds (DE # 103, filed December 9, 2003) at 17. In both the Order Denying Motion for Reconsideration and the Order Denying Motion to Dismiss, however, I relied on the fact, supported by citations to the record, that Carnival is a *Panamanian* corporation with its principal place of business in Miami. *See* Order Denying Reconsideration at 3 (citations omitted); Order Denying Motion to Dismiss at 2 (citations omitted). Accordingly, this Amended Order corrects the one reference to Carnival as a Florida Corporation with its principal place of business in Miami and consistently refers to Carnival as a Panamanian Corporation with its principal place of business in Miami.

("Atlantica"), an Italian-flagged vessel. (Complaint, DE # 1, filed February 3, 2003). Plaintiff alleges claims under the Jones Act and claims for unseaworthiness, failure to cure, and failure to treat. *Id.* Defendants sought dismissal of the case based on the doctrine of *forum non conveniens.* For the reasons explained below, I denied Defendants' Motion to Dismiss. *See infra* Part I. Defendants now urge me to reconsider this decision, and both parties have filed new exhibits in support of and against the Motion for Reconsideration. *See infra* Part II.

## I. Court's Order Denying Defendants' Motion to Dismiss on *Forum Non Conveniens* Grounds

I will give a brief summary of the Court's Order Denying Defendant's Motion to Dismiss on *Forum Non Conveniens* Grounds ("Order" or "Order denying dismissal"). The complete Order is attached as Exhibit A. In my previous Order, I explained that under Eleventh Circuit case law, the application of the Jones Act involves a question of choice of law, the determination of which requires a two-pronged inquiry. (Order at 6, *citing Szumlicz v. Norwegian America Line, Inc.,* 698 F.2d 1192, 1195 (11th Cir.1983)). First, the district court must decide, under choice of law principles, whether the law of the United States should be applied. (*Id.*). If United States law applies, the case should not be dismissed for *forum non conveniens.* (*Id.*).

In *Lauritzen v. Larsen,* 345 U.S. 571, 583–91, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), the United States Supreme Court outlined the following seven factors for determining whether the Jones Act is applicable to a claim: (1) the place of the wrongful act; (2) the law of the ship's flag; (3) the allegiance or domicile of the injured seaman; (4) the allegiance of the shipowner; (5) the place where the shipping articles

were signed; (6) the accessibility of the foreign forum; and (7) the law of the forum. (Order at 7). The Supreme Court subsequently emphasized that the *Lauritzen* factors were neither exhaustive nor meant to be applied mechanically to the facts of each case. (Order at 7, *citing Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 308–09, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970)). The Court then noted the importance of an eighth factor, the "shipowner's base of operations." (*Id., citing Rhoditis,* 398 U.S. at 309, 90 S.Ct. 1731). Although the *Rhoditis* Court referred to the "shipowner's" base of operations, the Court later noted that the operational contacts of both the ship and its owner were to be considered in the choice of law analysis. (*Id., citing Rhoditis,* 398 U.S. at 310, 90 S.Ct. 1731).

Relying on *Rhoditis,* the Eleventh Circuit held in *Szumlicz* that the substantial use of a United States "base of operations" by the vessel's owner, along with any other U.S. contacts, justified the application of the Jones Act, and, thus, precluded dismissal on the basis of *forum non conveniens.* (*Id.* at 8, *citing Szumlicz,* 698 F.2d at 1195). As in *Rhoditis,* the *Szumlicz* court reached this conclusion even though almost all of the other *Lauritzen* factors favored the defendant. (*Id., Szumlicz,* 698 F.2d at 1196).

Applying this Eleventh Circuit case law, I denied the Motion to Dismiss primarily due to my conclusion that Defendants' base of operations is in the United States. (Order at 11–22). As set forth in the Order denying dismissal, the M/S Costa Atlantica's owner is Costa Crociere, an Italian company that is at least 99% owned by Carnival, a Panamanian company with its principal place of business in Florida. (Order at 2 (citations omitted)). Costa Crociere, in turn, is the principal shareholder of the remaining Defendants.[2] (Or-

---

2. The remaining Defendants consist of the    following parties. Prestige, a Netherlands

der at 4 (citation omitted)). Finally, through Costa's wholly-owned subsidiary, Costa's decisions regarding payment of maintenance and cure benefits were made in Florida, either under the auspices of CSCS Caribbean, N.V. or through its authorized agent, International Risk Services, Inc. (IRSI). (Order at 5 (citation omitted)). IRSI administers medical benefits for CSCS International's employees and handles third party claims made against the company. (*Id.* (citation omitted)).

Based on the record before me, it was undisputed in the record that members of the Costa group sought to derive advertising and marketing benefits in this country through the use of the general identifying corporate name of "Costa" and that Costa Cruise Lines, another Costa subsidiary, participated in a coordinated effort to conduct a passenger cruise business in the United States. (Order at 13). Without dispute, Costa had been financially successful through its advertising and marketing efforts in the United States. (*Id.* at 14). I explained that the important question was whether these contacts amounted to a *substantial* relation to the United States. (*Id.* at 17, *citing Sigalas,* 776 F.2d at 1518). I concluded that the contacts did amount to a substantial relation, particularly due to the following facts. The Costa corporations, though nominally separate and distinct corporate entities, all function as interrelated parts of a worldwide "Costa" corporate group. (*Id.*). The key link to the United States is that Carnival, a Panamanian corporation, with its principal

place of business in Miami, is the principal shareholder (99%) of the parent company, Costa Crociere who, in turn, is the principal shareholder of the remaining defendants. (*Id.*). I noted that Carnival's SEC filings state that a 50% ownership interest typically evidences a "significant influence over financial and operating policies." (*Id.* at 18). Further, I stated that Carnival's principal shareholders are the Arisons, who live in Miami and conduct other business here. (*Id.*) These facts indicated that Carnival, the direct owner of Costa Crociere, had a significant influence over Costa's financial and operating policies and conducts its daily business operations in Miami, Florida. (*Id.*). I also found the following additional contacts: (1) during the period in question (October and November 2000), Costa operated the M/V Costa Atlantica, along with other ships, in the Carribean market, stopping in Ft. Lauderdale and Key West, Florida. (*Id.* at 19), (2) during one of these stops, Plaintiff was treated by a doctor in Ft. Lauderdale for the injuries in question (*Id.*), (3) through Costa's wholly-owned subsidiary, decisions regarding payment of maintenance and cure benefits were made in Florida, either under the auspices of CSCS Caribbean or through its authorized agent, IRSI (*Id.* at 20), and (4) benefits checks were being issued out of Florida on the CSCS International account as late as January 2003 (*Id.*). Accordingly, I denied the Motion to Dismiss.

## II. New Filings

█ The parties have filed a number of new exhibits and documents in support of and against reconsideration.[3] Based on

---

Antilles company, acted as the bareboat charterer of the vessel at certain times. (Order at 4 (citation omitted)). CSCS International, also a Netherlands Antilles corporation, was Plaintiff's employer. (*Id.* (citation omitted)). Costa Cruise Lines, another subsidiary of the Costa group, is the sales and marketing agent for Costa Crociere's vessels that call in the United States. (*Id.* (citations omitted)). Cos-

ta Cruise Lines is organized under the laws of the Netherlands Antilles and does business in the United States. (*Id.* (citation omitted)).

3. Plaintiff filed a Notice of Filing Documents in Opposition to Defendant's Motion for Reconsideration (DE # 108, filed December 31, 2003) consisting of the following documents: October 27, 1998 Casino Gaming Concession

Eleventh Circuit case law, I do not have to consider the filings that were available but not filed for my review before I issued the Order Denying Defendant's Motion to Dismiss. *See Cumulus Media, Inc. v. Clear Channel Communications, Inc.*, 304 F.3d 1167 (11th Cir.2002) ("[W]here a party attempts to introduce previously unsubmitted evidence on a motion to reconsider, the court should not grant the motion absent some showing that the evidence was not available during the pendency of the motion.") (quotation omitted). Several of Defendants' and Plaintiff's filings fall within this category. Even upon a review of these materials, however, I conclude that the decision to deny dismissal was proper.

The record before me on Defendants' Motion to Dismiss indicated that Carnival's principal place of business was in Florida and that the corporation owned at least 99% of Costa's shares. (Order at 2). The record that is before me now confirms that Carnival's headquarters are in Miami (Miguez Deposition at 155) and shows that Carnival owns 100% of Costa's shares

(2000 Annual Report at Note 1). In the "Notes to Consolidated Financial Statements," Carnival states that it operates six cruise lines under various brand names, including Costa. (*Id.* at Note 1). Carnival explains that since June 1997, it owned 50% of Costa, and on September 29, 2000 it completed the acquisition of the remaining 50% interest in Costa from Airtours at a cost of approximately $510 million. (*Id.* at Note 3). Further, according to Carnival's Chief Financial Officer, Carnival owns 100% of Costa's share capital and does not "contemplate reducing or disposing of [its] aforesaid control of Costa . . . ." (Plaintiff's Exh. 5).

In addition to providing further evidence of Carnival's presence in Florida and ownership of Costa, the new filings also demonstrate (1) contractual duties Carnival Corporation ("Carnival") undertakes on behalf of Costa, (2) the use of Florida law pursuant to these contracts and other Costa materials, (3) Carnival's assistance with Costa's debts, (4) advertising efforts Carnival conducts on behalf of Costa, (5) Car-

---

Agreement (Plaintiff's Exh. 1); June 1, 1998 Agreement appointing Carnival project manager in connection with the construction of a cruise ship for Costa (Plaintiff's Exh. 2); June 1, 1998 letter from Carnival to Costa (Plaintiff's Exh. 3); November 4, 2000 Casino Consulting Agreement (Plaintiff's Exh. 4); November 25, 2002 guarantee letter (Plaintiff's Exh. 5); January 1, 1995 Agency Agreement (Plaintiff's Exh. 6); July 1, 1999 Consulting Agreement (Plaintiff's Exh. 7); January 1, 2002 Consulting Agreement (Plaintiff's Exh. 8); March 1, 2002 Sublease Agreement (Plaintiff's Exh. 9); Costa Cruise ticket's forum selection clause (Plaintiff's Exh. 10); and December 4, 2000 Power of Attorney agreement (Plaintiff's Exh. 11). Plaintiff states that these documents were "recently obtained on December 17, 2003, as part of Production in another Costa case." (Notice of Filing at 1). Plaintiff also filed Carnival's 2000, 2001, and 2002 financial documents in opposition to the Motion for Reconsideration. (DE # 109, filed December 31, 2003). Finally, Plaintiff filed

the February 26, 2004 deposition of Enrique A. Miguez, Carnival's Assistant General Counsel (Miguez Deposition). (DE 124, filed March 4, 2004).

Defendants' also filed additional documents (DE # 110, filed January 5, 2004; DE # 113, filed January 9, 2004; DE # 1119, filed January 30, 2004) for me to consider: the December 12, 2002 Miguez deposition transcript (2002 Miguez Deposition); the July 24, 2001 Alberto Sacconaghi deposition transcript (Sacconaghi Deposition); Cavanna Deposition Stipulation; *Bautista v. Cruise Ships Catering & Serv. Int'l, N.V.*, Case No. 03–60160 (S.D.Fla. Jan. 5, 2004) (order denying motion for reconsideration); *Rodriguez v. Cruise Ships Catering & Serv. Int'l, N.V.*, Case No. 03–60288 (S.D.Fla. Jan. 5, 2004) (order denying motion for reconsideration); and January 21, 2004 Cavanna Sworn Statement (Cavanna Statement). Defendants also filed the same February 26, 2004 deposition transcript of Miguez that Plaintiff filed. (DE # 123, filed March 4, 2004).

nival's control over Costa through its officers, (6) Carnival's control over Costa's environmental compliance procedures, (7) Carnival's practice of reporting Costa's financial results, and (8) Defendants' contacts with the United States through International Risk Services ("IRSI").

## A. Contractual Duties Carnival Undertakes on Behalf of Costa

Carnival has entered into several contracts which allow it to perform duties on Costa's behalf.[4] In one of these contracts, executed on June 1, 1998, Carnival was appointed project manager in connection with the construction of a Costa cruise ship. (Plaintiff's Exh. 2). On the same day, Carnival wrote Costa a letter agreeing to act as the "owner's representative" on behalf of Costa in connection with the construction of the cruise ship. (Plaintiff's Exh. 3). Another agreement entered into on October 27, 1998 established Carnival as the exclusive provider of casino services on board eight Costa ships (Casino Gaming Concession Agreement, Plaintiff's Exh. 1 ¶ 1), including the M/S Costa Marina "through November 30, 2003 or until the conclusion of the cruise which ends at or most approximate to that date" (Plaintiff's Exh. 1 ¶ 2). Carnival agrees to provide at its sole expense the equipment necessary for the casino operations. (*Id.* at ¶ 3(b)). Carnival also agrees to repair, maintain, and replace the equipment as needed at its sole cost and expense. (*Id.*). The agreement allows Carnival to appoint personnel to manage CSCS's casino operations. (*Id.* at ¶ 3(g)). The agreement provides that Carnival's gaming equipment will receive insurance coverage under CSCS's hull and machinery policy at no extra cost to Carnival. (*Id.* at ¶ 5(a)(ii)).

Carnival entered into another agreement, this time with Costa itself, titled "Service and Procurement Agreement." (Miguez Deposition at Attachment marked Plaintiff's Exh. 1). This agreement allows Carnival, through its Global Source Division (CGS), to "negotiate and execute, in the name and on behalf of Costa, the supply of the products and services" set forth in the agreement. (Miguez Deposition at Attachment marked Plaintiff's Exh. 1 ¶ 3.1). In furtherance of the agreement, CGS can use Costa employees, instruments, and equipment. Further, "[e]very activity related to the performance which implies the access of CGS' employees to the offices of Costa, shall be carried out during normal working hours, without any interruption or disturbance to the activities carried out therein." (Miguez Deposition at Attachment marked Plaintiff's Exh. 1 ¶ 2.5(b)). Costa also grants CGS the power to (1) place supply and service orders in the name of and on behalf of Costa, (2) negotiate, execute and deliver notice, receipts, acknowledgments, amendments, addenda, or other documents, and (3) take actions or sign otherwise execute and deliver further documents or agreements that CGS deems necessary. (*Id.* at ¶ 3.2). The agreement grants John Meszaros, a United States citizen and Chief Procurement Officer of CGS, the power of attorney. (*Id.* at Exh. B). Pursuant to this power, Meszaros can undertake the above-listed actions to obtain food and beverage products, vessel equipment, entertainment services, and fuel products required for the cruises on behalf of Costa. (*Id.* at ¶¶ 1, 2, 4, 5). Further, Meszaros can negotiate, execute, and enforce agreements regarding embarkation and disembarkation with harbor authorities on behalf of Costa. (*Id.*

---

4. Prestige Executive Managing Director and financial director Alberto Sacconaghi's deposition reveals the existence of another Costa agent in the United States. According to him, Costa provides for and pays a maritime port agent in the United States to assist captains with any problems with their vessels. (Sacconaghi Deposition at 30).

at ¶ 3). Finally, he can "do all such things and take all such actions and sign or otherwise execute and deliver further documents or agreements as CGS shall in its discretion shall deem necessary or desirable" in order to effectuate the agreement. (*Id.* at ¶ 8). Miguez describes this power of attorney as granting Carnival the ability to seek bids and prices from vendors on behalf of Costa in Carnival's Miami office. (Miguez Deposition at 96).

## B. Defendants' Practice of Providing for Florida Law in their Agreements

Several of these contracts provide for the use of Florida law and courts in the event of a dispute. The Casino Gaming Concession Agreement states that it "shall be governed by the statutory Federal Maritime Law of the United States to the extent governed by Maritime Law and otherwise by the laws of the State of Florida." (Plaintiff's Exh. 1 ¶ 16). Disagreements regarding the interpretation or operation of the agreement may be arbitrated in Miami. (*Id.* at ¶ 17). A Casino Consulting Agreement between these two parties in November 4, 2000 also provides that the agreement "shall be governed by and construed in accordance with the substantive laws of Florida law" and that any dispute arising out of the agreement shall be settled by arbitration in Miami. (Plaintiff's Exh. 4 ¶¶ 5, 6).

Costa's cruise ticket also provides for the use of Florida law. The ticket states that all claims against Costa involving cruises which depart from, return to, or make any port call at a United States port shall be "instituted only in the courts of Miami–Dade County, Florida." (Plaintiff's Exh. 10 ¶ 19(a)).

## C. Carnival's Assistance with Costa's Debts

Carnival has provided a guarantee on several of Costa's debts. In 2001, Costa issued 300 million euro worth of bonds, guaranteed by Carnival, to fund the purchase of a vessel and refinance its debt. (2002 Miguez Deposition at 23). In a letter dated November 25, 2002, Carnival guaranteed a credit line for the issuance of a bank guarantee in the amount of 16.5 million dollars in the interest of Costa in order to comply with United States law. (Plaintiff's Exh. 5). Carnival has also guaranteed, through the P & I club (the insurance company for the vessels), Costa's financial responsibilities for calling on U.S. ports. (Miguez Deposition at 131–132). The P & I club issued the guarantee to the United States government. (*Id.* at 132). If the P & I club seeks reimbursement from Costa, and Costa fails to pay, P & I club can obtain the money from Carnival. (*Id.* at 132).

## D. Carnival's Advertising Efforts on Behalf of Costa

Carnival advertises on behalf of Costa. (Miguez Deposition at 116–117). Carnival created a program it calls "World Leading Cruise Lines" under which all Carnival operating brands, including Costa, participate. (*Id.*). Although Miguez states that Costa pays Carnival for the advertising conducted under the program, he cannot recall ever seeing written contract memorializing this payment for services. (*Id.* at 117).

## E. Carnival's Control over Costa through its Officers

Assistant General Counsel to Carnival Enrique Miguez states that the above-referenced contracts and agreements are "arms length transactions" that are negotiated between "separate legal entities." (Miguez Deposition at 78). As evidence of their separate status, he references the fact that the companies have independent management and marketing and finance

decisions. (*Id.* at 79, 83). He admitted, however, in his December 12, 2002 deposition that as 100% shareholder, Carnival ultimately controls the Board of Directors of Costa Crociere. (2002 Miguez Deposition at 5). At the time of that deposition, the Costa Crociere Board consisted of four members, and "the dominant presence" on the Board was Carnival Cruise or Carnival Corporation management and Board. (*Id.* at 18). Specifically, three out of the four members were Carnival Board members and directors and "obviously, exercise significant influence over the Board management decisions." (*Id.* at 25).

By the time of Miguez's February 26, 2004 deposition, Costa's Board consisted of five members, including Arison, Howard Frank, Gerry Cahill, Pier Foschi and Nicola Costa. (Miguez Deposition at 13). Arison, Howard, and Cahill live and work in Miami. (Miguez Deposition at 50, 52). Micky Arison is Carnival's Chief Executive Officer. (Miguez Deposition at 48). He and his family own 43% of Carnival's stock. (Miguez Deposition at 46). Howard Frank is Carnival's Vice Chairman and Chief Operating Officer. (*Id.* at 51). Cahill is Carnival's Executive Vice President, Chief Financial Officer, and Chief Accounting Officer of Carnival Corporation. (*Id.* at 51). Roberto Martenoli, the Senior Vice President of Shipboard Operations for Carnival, was formerly in charge of Costa's operations department. (Miguez Deposition at 34).

Pier Foschi, the Chief Operating Officer of Costa, sits on Carnival's Board as well and travels to Carnival's Miami office periodically. (Miguez Deposition at 119–120, 148, 153). Carnival's stock option plan is given to Costa and Carnival employees. (Miguez Deposition at 151–152). In February 2004, Foschi exercised these options, resulting in about two hundred thousand shares sold for the amount of 9.1 million dollars. (Miguez Deposition at 154). Car-

nival also offered its shareholders discounted room credits aboard various cruises, including Costa Cruises. (Carnival's 2000, 2001 and 2002 Annual Reports at Sections titled "Shareholder Benefit").

### F. Carnival's Control over Costa's Environmental Compliance Procedures

Carnival entered into an environmental compliance plan pursuant to a settlement agreement with the United States (Miguez Deposition at 138–141). Although Costa was not present during negotiations, it has to comply with the program and implement certain procedures pursuant to the plan. (*Id.*).

### G. Carnival's Practice of Reporting Costa's Financial Results

Carnival's annual reports include financial information about Costa. Costa's operating results in October and November 2000 were recorded as a direct adjustment to retained earnings in Carnival's November 30, 2000 consolidated balance sheet. (*Id.*). Carnival's November 30, 2000 consolidated balance sheet includes Costa's November 30, 2000 balance sheet. (*Id.* at Note 3 and Note 5). Further, "[c]ommencing in fiscal 2001, Costa's results of operations will be consolidated on a current month basis in the same manner as the Company's other wholly-owned subsidiaries." (*Id.* at Note 3). Financial results reported in Note 10, "Segment Information," include Costa in Carnival's cruise segment assets. (*Id.* at Note 10). Carnival includes $13.1 million of nonrecurring gains related to the reversal of certain Costa's tax liabilities in its net income figures for fiscal quarter ended February 20, 2000 and May 31, 2000. (*Id.* at Selected Quarterly Financial Data (Unaudited)).

During the year 2001, Carnival transferred two vessels from its North American brands to Costa Cruises to accelerate

its growth in the European vacation Market. (2001 Annual Report at 2). Carnival states, "[W]e are capitalizing on Costa's powerful brand recognition in Italy, France and Spain through the introduction of three new vessels specifically designed for the European vacation market. We are expanding Costa's presence in Europe by offering a cruise product created to appeal to the preference of our German guests." (*Id.* at 3). Its cruise segment included six cruise brands "which have been aggregated as a single operating segment based on the similarity of their economic and other characteristics." (*Id.* at Note 12). Approximately $340 million of Carnival's cruise operating cost increase was due to the consolidation of Costa, and the remaining $83 million of its cost increase was due to its other brands. (2001 Annual Report at 26). Approximately $98 million of its selling and administrative expenses increase was due to the consolidation of Costa, and the remaining $33 million of the increase was from Carnival's other brands. (*Id.*). The 2001 Annual Report further states that Carnival "recorded income of $77 million during 2000 from [its] interest in Costa." (*Id.* at 27).

In the year 2002, Carnival's long-term debt included a euro floating rate note, collateralized by one Costa ship, for a total of $118,727 in United States dollars. (2002 Annual Report at Note 6). The ships under contract for construction as of November 30, 2002 included three Costa ships for a total estimated cost of approximately $1.6 billion dollars. (2002 Annual Report at 12). In the contingencies section of its 2002 Annual Report, Carnival includes a description of actions that have been filed against Costa. (*Id.* at Note 8). It also includes information regarding Cost in its

"Income and Other Taxes" section, stating that in fiscal 2002, it recognized a net $57 million income tax benefit primarily due to a new Italian investment incentive law, which allowed Costa to receive $51 million income tax benefit based on contractual expenditures during 2002 on the construction of new ships. (*Id.* at Note 9). The 2002 Annual Report also states that during fiscal 2002, Carnival borrowed $232 million, which included $150 million under Costa's euro denominated revolving credit facility. (*Id.* at 28). In addition, Carnival made $190 million of principal repayments, primarily on Costa's revolving credit facility and Costa's collateralized debt. (*Id.*).

In his sworn statement, Costa General Counsel Paolo Cavanna states that the reason Carnival presents a consolidated balance sheet and financial statements which include Costa's financial performance is because as a New York Stock Exchange, it has to present its information to stockholders in accordance with United States law, which means it has to give stockholders a complete picture of the state of the company where they have put their money. (Cavanna Statement at 18–19). Miguez states that Carnival includes Costa in its financial reporting pursuant to Generally Accepted Accounting Principles (GAAP) and "in order to present a clear, complete and fair picture of the financial results of the company [Carnival includes] the operations of all its operating companies into the financial statements." (Miguez Deposition at 19–20).

### H. Defendants' Contacts with the United States through IRSI

The new exhibits provide further evidence of Defendants', especially CSCS'[5],

---

**5.** CSCS has an additional United States contact: a First Union account in Miami that holds few thousand dollars to take care of expenses and emergencies in the United

States (Sacconaghi Deposition at 37, 40). Alberto Sacconaghi, the Executive Managing Director of Prestige, can sign on the account. (*Id.* at 37).

ties with the United States through IRSI, a Florida corporation with an address in Miami Beach. (Plaintiff's Exh. 7). IRSI and CSCS entered into a Consulting Agreement on July 1, 1999 whereby IRSI agrees to handle all medical and insurance claims for onboard personnel. (*Id.* at 3(a)). The agreement states that CSCS shall cause Costa Cruise Lines to sublet office space in Miami to IRSI. (*Id.* at ¶ 6). An attachment to the agreement titled "Crew Claims Arising In the Western Hemisphere" allows IRSI to develop a detailed procedure to handle all past, current, and future claims on behalf of CSCS. Finally, the agreement provides that it "shall be governed by and construed in accordance with the substantive laws of Florida." (*Id.* at ¶ 10(g)).

The two parties entered into another consulting agreement on January 1, 2002. (Plaintiff's Exh. 8). This time the IRSI office involved in the contract was IRSI in Hollywood, Florida.[6] (*Id.*). The agreement states that it "shall be governed by and construed in accordance with the substantive laws of Florida." (*Id.* at ¶ 10(g)). An attachment to the agreement requires IRSI to develop detailed procedures to process all past, current, and future crew claims.

CSCS entered into a Power of Attorney on December 4, 2000 appointing IRSI's principal, Laurence Klutz of Miami Beach, Florida, "the true and lawful attorney for and on behalf of the Company." (Plaintiff's Exh. 11). The Power of Attorney authorizes Klutz to act in the name of CSCS in connection with claims, mediations, arbitrations, litigation and trial brought by crew against CSCS. (*Id.*). It also empowers Klutz, in his absolute discretion, to take all actions he deems necessary or appropriate in connection with the above powers. (*Id.* at ¶ 3). Miguez states in his deposition that Klutz works in some capacity for Costa or one if its companies, perhaps as a consultant. (Miguez Deposition at 66).

Cavanna states that many of CSCS's crew functions are handled in Genoa, so IRSI does not provide all the crew personnel functions for CSCS's employees. (Cavanna Statement at 33). Although Cavanna denies any relationship between Costa and IRSI, he admits that IRSI has to obtain approval from Costa's subsidiaries before offering services to a competitor. (Cavanna Statement at 32).

### Legal Standard

A motion for reconsideration may be brought pursuant to Rule 59(e) or Rule 60(b). *See Sussman .v. Salem, Saxon & Nielsen, P.A.,* 153 F.R.D. 689, 694 (M.D.Fla.1994) (*quoting Lewis v. United States Postal Service,* 840 F.2d 712, 713 n. 1 (9th Cir.1988)). Under which Rule the motion falls "turns on the time at which the motion is served. If the motion is served within ten days of the rendition of the judgment, the motion falls under Rule 59(e); if it is served after that time, it falls under Rule 60(b)." *Id.* Here, Defendants filed two identical Motions for Reconsideration. One Motion, however, was filed within ten days of the judgment, making it fall under Fed.R.Civ.P. 59(e), while the other Motion was filed after the ten-day period, making it fall under Fed.R.Civ.P. 60(b). Accordingly, I will examine the Motion under both standards.

While Rule 59(e) does not set forth any specific criteria, the courts have delineated three major grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new

---

**6.** Costa Cruise Lines entered into a sublease agreement with IRSI on March 1, 2002 whereby Costa Cruise liens leased premises to IRSI in Hollywood, Florida. (Plaintiff's Exh. 9).

evidence; and (3) the need to correct clear error or prevent manifest injustice. *See Sussman v. Salem, Saxon & Nielsen, P.A.,* 153 F.R.D. 689, 694 (M.D.Fla.1994); *see also* 18 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4478 (1981). In order to reconsider a judgment, there must be a reason why the court should reconsider its prior decision, and the moving party must set forth facts or law of a "strongly convincing nature" to induce the court to reverse its prior decision. *Id.* The district court's decision regarding a Rule 59(e) motion is reversible only for abuse. *See Huff v. Metropolitan Life Ins. Co.,* 675 F.2d 119, 122 (6th Cir. 1982).

Federal Rule of Civil Procedure 60(b) does set forth specific grounds for relief. It provides that upon motion, "the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding" for (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud, misrepresentation, or other misconduct of an adverse party; (4) any other reason justifying relief from the operation of the judgment. Fed. R.Civ.P. 60(b). Rule 59(e) does not set forth any specific grounds for relief, and the district court has considerable discretion in whether to reconsider an issue. *See American Home Assurance Co. v. Glenn Estess & Associates,* 763 F.2d 1237, 1238–39 (11th Cir.1985).

█ District court decisions on motions for reconsideration are reviewed for abuse of discretion, thus affording the courts with substantial discretion in their rulings. *See id.; see also Mackin v. City of Boston,* 969 F.2d 1273, 1279 (1st Cir.1992). A district court abuses its discretion when a "relevant factor deserving a significant weight is overlooked, when an improper factor deserving of significant weight is overlooked, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales." *See id. (citing United States v. Hastings,* 847 F.2d 920, 924 (1st Cir.1988)). Furthermore, reconsideration of a previous order is "an extraordinary remedy, to be employed sparingly." *See Mannings v. School Board of Hillsborough County,* 149 F.R.D. 235, 235 (M.D.Fla.1993).

### Analysis

Applying the above-stated legal standards to the facts of this case leads me to deny reconsideration. Defendants' arguments are not based on an intervening change in controlling law or fraud, misrepresentation, or other misconduct on the Plaintiff's part. See supra Part titled "Legal Standard" regarding grounds for reconsideration under Rules 59(e) and 60(b). Accordingly, I will examine Defendants' Motion under the remaining Rule 59(e) and Rule 60(b) standards: (1) mistake, inadvertence, surprise, or excusable neglect, or the need to correct clear error and (2) new evidence. I will then discuss why this case is appropriate for certification (see infra Part III).

### I. Mistake, Inadvertence, Surprise, Excusable Neglect, or the Need to Correct Clear Error

Defendants argue that my Order denying dismissal was incorrect due to the following reasons: (1) the proper scope of the base of operations factor focuses on the day-to-day operations, not on corporate stock ownership; (2) the Court wrongly cited to Carnival's accounting policies to show Defendants' contacts with the forum; and (3) assertions of American stock ownership are incorrect. As set forth below, I conclude that none of these grounds warrant reconsideration.

■ Defendants' first major argument is that I misapplied the base of operations factor as articulated in Rhoditis and Sigalas by focusing on corporate stock ownership rather than the day-to-day operations. Both these cases, however, do examine corporate stock ownership in analyzing the base of operations factor. The Rhoditis Court concluded that—the base of operations of the ship and its owner was in the United States based on the following evidence: (1) a U.S. domiciliary held ninety-five percent of the stock of the Greek corporation that owned the vessel and (2) the vessel was not a "casual visitor" to the United States but rather earned "income from cargo originating or terminating here." *Rhoditis,* 398 U.S. at 310, 90 S.Ct. 1731. The *Sigalas* court also examined the stock ownership of the Defendant corporation and noted that the 80% of the stock was owned by Greek individuals. *Sigalas,* 776 F.2d at 1518. It distinguished the *Rhoditis* case partly because of the fact that 95% of the stock of the vessel owner was ultimately owned by an American domiciliary. In this case, 100% of the vessel owner's stock is owned by Carnival, which is headquartered in Miami. Further, I previously concluded, in addition to the fact that Costa's stock is owned by a company headquartered in Miami, that members of the Costa group sought to derive advertising and marketing benefits in this country through the use of the general identifying corporate name of "Costa" and that Costa Cruise Lines, another Costa subsidiary, participated in a coordinated effort to conduct a passenger cruise business in the United States. (Order at 13). Without dispute, Costa had been financially successful through its advertising and marketing efforts in the United States. (*Id.* at 14). I also found the following additional contacts: (1) during the period in question (October and November 2000), Costa operated the M/V Costa Atlantica, along with other ships, in the Carribean market, stopping in Ft. Lauderdale and Key West, Florida. (*Id.* at 19), (2) during one of these stops, Plaintiff was treated by a doctor in Ft. Lauderdale for the injuries in question (*Id.*), (3) through Costa's wholly-owned subsidiary, decisions regarding payment of maintenance and cure benefits were made in Florida, either under the auspices of CSCS Caribbean or through its authorized agent, IRSI (*Id.* at 20), and (4) benefits checks were being issued out of Florida on the CSCS International account as late as January 2003 (*Id.*). Thus, applying Supreme Court and Eleventh Circuit case law to the facts of this case, I concluded then as I do now, that Defendants' base of operations is in the United States.

■ Defendants next argue that the Court wrongly cited to a Note in an SEC filing regarding Carnival's accounting policies to show Defendants' contacts with the forum. They state that the Note merely indicates that Carnival's accounting policies mandate Costa's financial performance be included in Carnival's consolidated financial reports. Portions of the record before me now indicate that Carnival extensively reports Costa's financial performance (see supra Part titled "Background" at II.G) to meet GAAP requirements and to provide stockholders with a complete picture of the state of the company in which they have invested their money. (Miguez Deposition at 19–20; Cavanna Statement at 18–19). The fact that Carnival's own accounting policies and GAAP require including Costa's financial performance in Carnival's reports indicates that these companies are closely related and thus further buttresses my conclusion that Carnival uses Costa to conduct business.

■ Finally, Defendants argue that assertions of American stock ownership are incorrect because Carnival CEO Arison is not an American citizen and Carnival is a

Panamanian, not American, corporation. My previous Order, however, did not state that Arison is an American citizen; rather, it stated that he resides in Florida and that the parties did not dispute this point during oral argument. (Order at 3). Further, the Order correctly stated, based on Carnival's SEC filings, that Carnival is a Panamanian corporation with its principal place of business in Florida. (Order at 2). In *Rhoditis*, the 95% stock owner of the shipowner was a Greek citizen who resided in the United States. *Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252. Thus, the facts that Arison resides in and conducts business in Florida (Order at 3–4), and that Carnival's principal place of business is in Florida (Order at 2) supports my conclusion that Defendants' base of operations is in the United States.

## II. Newly Discovered Evidence

■ As indicated in the Background section, supra, of this Order, the parties submitted a number of additional exhibits for me to review in considering whether to grant reconsideration. These filings simply provide further evidence of Defendants' United States-based operations. The exhibits reveal (1) numerous contractual duties Carnival Corporation ("Carnival") undertakes on behalf of Costa, (2) the use of Florida law pursuant to these contracts and other Costa materials, (3) Carnival's assistance with Costa's debts, (4) advertising efforts Carnival conducts on behalf of Costa, (5) Carnival's control over Costa through its officers, (6) Carnival's control over Costa's environmental compliance procedures, (7) Carnival's practice of

reporting Costa's financial results, and (8) Defendants' contacts with the United States through International Risk Services ("IRSI"). These facts demonstrates Costa's and its subsidiaries' use of the United States-based Carnival Corporation and the use of Florida law when conducting their business. Thus, a review of the entire record simply strengthens my conclusion that Defendants' base of operations is in the United States.

■ Defendants also filed new decisions in support of their Motion. See *Bautista v. Cruise Ships Catering & Serv. Int'l, N.V.*, Case No. 03–60160 (S.D.Fla. Jan. 5, 2004) (order denying motion for reconsideration) and *Rodriguez v. Cruise Ships Catering & Serv. Int'l, N.V.*, Case No. 03–60288 (S.D.Fla. Jan. 5, 2004) (order denying motion for reconsideration). Judge Dimitrouleas' decisions began with the premises that reconsideration requires more than simply restating arguments, that arguments not made in earlier motions will be deemed waived, and that reconsideration is an extraordinary remedy. *Bautista*, Case No. 03–60160 at 1–2; *Rodriguez*, Case No. 03–60288 at 1–2. Applying these principles, Judge Dimitrouleas rejected Plaintiffs' Supplemental B arguments and refused to consider Plaintiffs' "new evidence" because it might have been available earlier and because it did not present new facts. *Bautista*, Case No. 03–60160 at 2; *Rodriguez*, Case No. 03–60288 at 2. I already explained in detail my reasons for disagreeing with Judge Dimitrouleas' decisions dismissing his cases on *forum non conveniens* grounds (Order at 14–19).[7] I agree with his rejection of

---

7. I disagree with Judge Donald L. Graham's decision in *Hernandez v. Cruise Ships Catering and Services International*, Case No. 03–20302 (S.D.Fla. Dec. 8, 2003) (order granting dismissal on *forum non conveniens* grounds), which was based on the *Bautista* and *Rodriguez* decisions, for the same reasons I disagree with Judge Dimitrouleas' decisions.

(*See* Order at 14–19). In Judge Graham's case, the two plaintiffs alleged that the lifting and carrying of heavy objects onboard the *Victoria*, the Costa vessel involved in that case, caused them to suffer personal injuries. *Hernandez*, Case No. 03–20302 at 2. Citing solely to *Bautista* and *Rodríguez* during his discussion of the base of operations, Judge

Plaintiff's Supplemental Rule B argument.[8] Further, although I agree that I do not have to consider new evidence that was available before, even upon considerations of these new filings, I conclude that reconsideration is not warranted.

### III. This case is appropriate for certification.

28 U.S.C. § 1292(b) allows a party to seek interlocutory review of a case under certain circumstances which are present in this case. Specifically, Section 1292(b) provides as follows:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially

Graham concluded that "while Costa Crociere performs certain marketing, sales and crew maintenance activities in Florida through its agents, it does not, however, utilize this state as its base of operations." *Id.* at 4–5. Judge Graham stated that other than making infrequent stops in Florida, every decision regarding the Victoria's daily operations takes place outside the United States. *Id.* Judge Graham then concluded that "based on the weight of the eight applicable factors" that foreign law was applicable to the case. *Id.* at 5.

Judge Graham did not consider several factors that led me to deny dismissal based on *forum non conveniens* grounds. First, he does not address the fact that Carnival is the principal shareholder of Costa who, in turn, is the principal shareholder of the remaining defendants. He does not examine the fact that Carnival's principal shareholders are the Arisons, who live in Miami and conduct other business here. Nor does he discuss the facts that decisions regarding payment of maintenance and cure benefits were made in Florida through Costa's wholly-owned subsidiary and that benefits checks were being issued out of Florida on the CSCS International account as late as January 2003. These facts indicated that Carnival, the direct owner of Costa Crociere, had a significant influence over Costa's financial and operating policies and that Costa conducts its daily business operations in Miami, Florida. Accordingly, I respectfully disagree with Judge Graham's decision, which did not consider several of the factors I found persuasive in denying dismissal.

8. Plaintiffs make a new argument for jurisdiction based on Supplemental Rule B. Supplemental Rule B authorizes garnishment of assets of a foreign or other entity if that entity cannot be found in the forum. In this case, there was Supplemental Rule B attachment. The Middle District of Florida has held that this type of attachment establishes personal jurisdiction. *Linea Navira De Cabotaje, C.A. v. Mar Caribe De Navegacion, C.A.*, 169 F.Supp.2d 1341 (2001). The court explained that Rule B attachment occurs when the defendant is not found in the district. *Id.* at 1351. In denying a defendant's motion to dismiss based on forum non conveniens, the court stated, "Therefore, this action is only here because of [the defendant's] limited contact with the forum. That is simply the nature of the proceeding. [Defendant's] requests to dismiss on the basis of convenience is not well taken." *Id.* The court concluded that by virtue of Supplemental Rule B attachment of the defendant's bank account, it had personal jurisdiction. *Id.* The court also stated that it had not found any Eleventh Circuit case on point. *Id.* Defendants, however, cite a number of cases that suggest differently. (Reply, DE # 111, at 2 (citations omitted)). Further, they point out that the Eleventh Circuit has dismissed based on forum non conveniens even where a "Letter of Undertaking" in an in rem proceeding was before the lower court. See *Sigalas v. Lido Maritime, Inc.*, 776 F.2d 1512, 1515 (1985).

I conclude that Plaintiff's Rule B argument is unconvincing. It is based on one Middle District of Florida case that does not include extensive analysis, and there is no Eleventh Circuit case law directly on point. Further, Defendants cite several cases that take the opposite view. Upon review of the parties' arguments and the case law, I conclude that I should conduct an independent forum non conveniens analysis rather than simply establishing jurisdiction through an early proceeding that does not require an in-depth analysis of jurisdiction.

advance the ultimate determination of litigation, he shall state so in writing in the order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order . . . .

28 U.S.C. § 1292(b).

■ This case involves a controlling question of law, whether the United States can be considered the base of operations for a shipowner that is owned by a company that primarily conducts its business in the United States. There is substantial ground for difference of opinion regarding this issue, as evidenced by the different conclusions three Judges in this Court have reached when examining the same issue. Further, an immediate appeal from this Order may materially advance the ultimate determination of this litigation. Proceeding with this case will require the use of the parties' time and money and considerable judicial resources to examine each of Plaintiff's claims and potentially proceed to trial. If the Eleventh Circuit, however, decides to review this case and determines that dismissal is warranted, these resources can be conserved. Accordingly, I conclude that this case is appropriate for certification. Defendants shall have ten days from the date of entry of this Order to seek immediate review before the Eleventh Circuit.

Based on the foregoing, it is hereby ORDERED and ADJUDGED:

1. Defendants' Motions for Reconsideration (DE # 106, 116) are DENIED.

2. Defendants have ten days from the date of entry of this Order to seek immedi-ate review before the Eleventh Circuit pursuant to 28 U.S.C. § 1292(b).